[No. A054434. First Dist., Div. Four. Apr. 27, 1992.]

RUBEN SEGURA, Plaintiff and Respondent, v.
DOROTHY McBRIDE, Defendant and Appellant.

**COUNSEL**

Harland & Gromala and Geri Anne Johnson for Defendant and Appellant.

Sapper & Stone and Sam L. Stone for Plaintiff and Respondent.

**OPINION**

**ANDERSON, P. J.**—This appeal raises first impression questions concerning the class of persons regulated pursuant to Civil Code[1] section 1695 et seq. (hereafter the Home Equity Sales Contract Act, or Act), as well as the measure of damages available thereunder. We hold that except for certain persons specifically exempted from regulation, the Act applies to *all* persons who purchase a residence subject to an outstanding notice of default, regardless of whether the purchaser routinely engages in such transactions, and regardless of whether the distressed buyer initiates the negotiations. We further set forth the measure of damages and date of assessment for particular violations, and partially reverse for prejudicial error in assessing damages.

## I. FACTS

### A. *Background*

In April 1979 respondent Ruben Segura purchased property in Ferndale[2] from Mr. and Mrs. Dilleshaw for approximately $30,500, with a cash down payment of $8,000. The Dilleshaws took back a note and deed of trust for the remainder; eventually the Bank of Loleta assumed collection of Segura's note payments for the Dilleshaws.

In early 1982 Segura fell behind on his house payments as well as payments to the Bank of Loleta for financing his truck. He obtained a loan

---

[1]Unless otherwise specified, all statutory references are to the Civil Code.

[2]The property consisted of two lots plus part of a third. One lot contained a residence and next to that was a small triangular parcel. The largest lot was unimproved.

from the bank in the amount of $6,629, which it secured with a second deed of trust on the property. Segura defaulted on that obligation and the bank initiated foreclosure proceedings in July 1982. The notice of default specified that Segura was in arrears in the amount of $2,118 and additionally owed late charges and $778 for sums advanced by the bank on related delinquencies.

Segura approached appellant Dorothy McBride about his financial predicament in hopes they could work something out so he could hold onto his house. He felt McBride and her late ex-husband Rex were like "family" to him. Segura had lived with Rex for a while and cared for him when he was sick; they had been fellow members of the Ferndale Rotary Club.

Segura then met with Henry Weller, manager of the Bank of Loleta, indicating he would try to cure the default and suggesting McBride might be willing to assist. Weller discussed matters with McBride and considered himself "in the middle" of the transaction evolving between the two. Nothing, however, was set down in writing.

Ultimately, in November 1982 Segura and McBride met at the Bank of Loleta where Segura executed a grant deed conveying all of his property to her. She paid $12,000 to retire the Bank of Loleta note and bring the Dilleshaw note and taxes, etc., current. Thereafter McBride commenced monthly payments of $180 on the Dilleshaw obligation, maintained taxes and insurance and charged Segura $200/month to live in the residence. Both parties expected that McBride would transfer title back to Segura within a relatively short time frame, but they disagreed as to the conditions, if any, of the transfer.

In March 1983 McBride's bookkeeper advised Segura in writing that he was two months behind on the rent for "the property taken over by Mrs. Viola McBride to prevent foreclosure." The letter warned: "It is imperative that these payments be made regularly as we, in turn, are making payments to Mrs. Dilleshaw. [¶] If not, it will be necessary for Mrs. McBride to resell the property." She sent a similar letter in February 1984, advising that the balance owing was $1,300. Through November 1983, Segura paid McBride a total of $1,900.

A year later McBride conveyed an undivided one-third interest in the property to her son, Jon McBride, her granddaughter and herself; she transferred the remaining interest to the granddaughter in June 1985. Jon McBride took over payment of insurance, taxes and the Dilleshaw note; he also began charging Segura $350 a month to live on the premises, receiving

only one such payment. Some time in 1985 Jon McBride instituted an unlawful detainer proceeding against Segura but dropped it when Segura left the premises. He ordered the removal of Segura's personal property, including his carpentry tools, from the house.

In May 1985 Segura tendered $15,000 through his attorney to "buy [his] property back." The tender was refused.

Thereafter Jon McBride and his daughter sold the improved lot and the small triangular unimproved lot for $36,900, and the large unimproved lot for $21,000. These sales took place in March 1986 and July 1988 respectively.

## B. *Complaint, Trial and Decision*

Segura brought this action against McBride alleging violations of the Home Equity Sales Contract Act. The primary legal issue submitted for decision was whether the Legislature intended the Act to apply to purchasers who were not in the business of buying home equities from distressed homeowners in situations where the homeowner sought out the purchaser's assistance. McBride called Thomas Stollard, director of the Legislative Intent Service, as an expert witness on this subject. He offered his opinion, based on analysis of pertinent legislative history, that the legislation "was not intended to apply in a case where a party has approached someone else to essentially sell their property to relieve their financial distress."

The factual dispute in the court trial[3] centered on the details of the Segura-McBride agreement, details which unfortunately were never committed to writing. Segura testified that he offered to sell the unimproved lot to McBride for $25,000. He further understood that the previous owner had "split" the lots and, thus, he could now sell the unimproved lot separately. Mrs. Dorothy Lorenzo, a realtor friend of his, told him a lot in that area would go for between $25,000 and $28,000.

McBride responded that she did not need the property, but she agreed to help him out. Additionally, she brought to his attention that his ex-wife had recorded a lien against his property. She explained that on several occasions one of her sons would sign his property over to her to avoid claims by a girlfriend, and she would then give the property back to him after a year. Segura "took it on her word" that McBride did this for her son and, thus, he proceeded to deed all his property to her so no one could touch it. Segura

---

[3]Segura represented himself at the liability phase of the trial. The judge questioned Segura, and also participated in questioning other witnesses.

concluded: "well, just like family, I'll sign it over, and in a year, I'll get my—the remainder of whatever money—. . ."

It was Segura's understanding that whatever expenses McBride incurred with respect to the property would come out of the $25,000, and at the end of the year she would give him the remainder of the sale price plus "title to the house" and the adjoining small triangular lot. He did not foresee any problem with her conveying two instead of three lots because the property was already divided. Segura vehemently denied that he agreed to pay $200 a month rent.[4] He made some payments, but never understood why she asked him to make them.

McBride explained the agreement differently. She testified that Segura came to her in 1982 and told her he was losing his place to the bank remarking, " 'You might as well have it as the bank . . . .' " She took this to mean he wanted her to buy the property. She paid off the arrearages, cured the default and he signed the property over to her. He agreed to pay $200 a month in rent to stay in the house. Mrs. McBride understood that in a short period of time Segura would come up with the money to buy the property back from her. Bank manager Weller related a similar understanding of the transaction: Mrs. McBride would "bail him out" by curing all delinquencies in exchange for an outright deed of the property. Segura could rent back the house and if he came up with funds to cash her out in a reasonable length of time—everyone thought a year or less—she would reconvey the property to him.

The trial court concluded Segura was entitled to damages under the Act and entered judgment in his favor for $41,592 plus interest at the rate of 10 percent from the date of filing the complaint (Oct. 29, 1986).

## II. DISCUSSION

### A. *Statutory Scheme*

The Home Equities Sales Contract Act is a comprehensive set of laws designed to protect homeowners in default against unfair purchases of their home equity. The Legislature recognized that the equity value of a residence, often a homeowner's most significant financial asset, could be lost to a third

---

[4]In contrast, the unverified first amended complaint, signed by Attorney Jack Crlenjak, whom Segura later discharged, stated that Segura "was to continue to use residence, and . . . to pay $200 per month to Defendant McBride to cover costs of ownership of property . . . ."

party purchaser whenever a homeowner facing foreclosure succumbed to a proposal to sell his or her home for a fraction of its value.[5]

In response to these findings, the Act seeks to regulate transactions between an equity purchaser and an equity seller resulting in the sale of residential real property in foreclosure.[6] At the heart of the scheme is the requirement that the agreement between buyer and seller be in writing, with specific terms aimed at protecting the homeowner. (§§ 1695.2, 1695.3, 1695.5.) The contract must include the total consideration given, terms of payment and terms of any rental agreement; a conspicuous statement of the right to cancel within five business days or until 8 a.m. on the day scheduled for foreclosure, with an attached notice of cancellation; and a conspicuous notice that until the right to cancel has ended, the equity purchaser cannot ask the seller to sign a deed or any other document. (§§ 1695.3-1695.5.) The equity purchaser must provide, and complete, the contract in conformity with these terms. (§ 1695.6, subd. (a).)

During the "cooling off" period, the equity purchaser cannot take title to the property by written instrument or recordation thereof; transfer or encumber any interest in the property; or pay the seller any consideration. (§ 1695.6, subd. (b).) Moreover, the purchaser cannot make untrue or misleading statements about the value of the property, any foreclosure proceeds, or the terms of sale. (§ 1695.6, subd. (d).) Additionally, when the seller

---

[5]We quote the key findings and declarations set forth in section 1695: "(a) The Legislature finds and declares that homeowners whose residences are in foreclosure have been subjected to fraud, deception, and unfair dealing by home equity purchasers. The recent rapid escalation of home values, particularly in the urban areas, has resulted in a significant increase in home equities which are usually the greatest financial asset held by the homeowners of this state. During the time period between the commencement of foreclosure proceedings and the scheduled foreclosure sale date, homeowners in financial distress, especially the poor, elderly, and financially unsophisticated, are vulnerable to the importunities of equity purchasers who induce homeowners to sell their homes for a small fraction of their fair market values through the use of schemes which often involve oral and written misrepresentations, deceit, intimidation, and other unreasonable commercial practices. [¶] (b) The Legislature declares that it is the express policy of the state to preserve and guard the precious asset of home equity, and the social as well as the economic value of homeownership."

[6]"Residential real property in foreclosure" is property consisting of one- to four-family dwelling units, one of which is owner occupied, and against which there is an outstanding notice of default. (§ 1695.1, subd. (b).)

An "equity purchaser" is "any person who acquires title to any residence in foreclosure" except someone acquiring title: (1) for use as a personal residence; (2) by deed in lieu of foreclosure of a voluntary lien or encumbrance of record; (3) by deed from a trustee acting under the power of sale in a deed of trust; (4) by any sale authorized by statute; (5) by court order; or (6) from a spouse, blood relative, or blood relative of a spouse. (§ 1695.1, subd. (a).)

An "equity seller" is "any seller of a residence in foreclosure." (§ 1695.1, subd. (c).)

grants the residence by an instrument purporting to be an absolute conveyance but reserves or is given an option to repurchase,[7] the equity purchaser cannot grant any interest in the property to another without the written consent of the seller. (§ 1695.6, subd. (e).) Finally, it is unlawful to take unconscionable advantage of the property owner in foreclosure. (§ 1695.13.) Depending on the nature of the violation, the aggrieved seller may be entitled to rescission, other equitable relief or damages, including exemplary damages. (§§ 1695.7, 1695.14.)

## B. *Persons Regulated by the Act*

McBride first contends the trial court erred in applying the Act to her. She argues that when the Legislature enacted the above described protective scheme, it was concerned with individuals engaged in the business of purchasing equities, who solicited equity refinancing as a business practice. She claims that "implicit" in this focus is the absence of an intention to regulate isolated buys by persons neither soliciting nor in the business of equity purchasing. We disagree.

First, we point out that McBride's factual contention is inaccurate. True, Segura initially sought her out, but according to his recitation of facts, the deal that was struck was not his deal. He claimed he offered to sell her one lot for a set price; she ended up taking a deed to the entire property and no cash changed hands. Thus, under Segura's facts McBride made *her own* offer to bail him out of his present predicament, and he trusted she would reconvey the property within a short period of time after taking care of the arrearages. Acknowledging that there were conflicting recitations about the nature of the parties' agreement, the trial court apparently did not choose sides. Instead, focussing on the outcome of the transaction, it concluded that however well intentioned the parties were,[8] McBride violated the statute.

Second, we see no evidence of a legislative intent to exempt individuals such as McBride from regulation. Our mandate when construing statutes is to pursue the intention of the Legislature, if possible. (Code Civ. Proc., § 1859.) Here the legislative intent is expressly declared and, thus, we need not delve into the numerous extrinsic aids (even assuming they were properly admissible to prove legislative intent), which McBride discusses in order to divine this intent: "(d) The intent and purposes of this chapter are the following: [¶] (1) To provide each homeowner with information necessary to make an informed and intelligent decision regarding the sale of his or

---

[7]Subject to the rights of bona fide purchaser, there is a presumption affecting the burden of proof that such a transaction is a loan transaction, and the purported absolute conveyance is a mortgage. (§ 1695.12.)

[8]This conclusion appears to be in conflict with the court's additional finding that "[u]nconscionable advantage was taken of plaintiff in this transaction," in violation of section 1695.14.

her home to an equity purchaser; to require that the sales agreement be expressed in writing; to safeguard the public against deceit and financial hardship; to insure, foster, and encourage fair dealing in the sale and purchase of homes in foreclosure; to prohibit representations that tend to mislead; to prohibit or restrict unfair contract terms; to afford homeowners a reasonable and meaningful opportunity to rescind sales to equity purchasers; and to preserve and protect home equities for the homeowners of this state. [¶] (2) This chapter shall be liberally construed to effectuate this intent and to achieve these purposes." (§ 1695, subd. (d).)

While the archetype prompting the Legislature to regulate the field of equity purchases may well have been the business person who seeks out and preys upon distressed homeowners, the resulting legislation embraced a broader class of persons in order to systematically protect homeowners from the unfair loss of the precious asset of home equity. Thus, the Act regulates not only the archetypal predator, but *all* equity purchasers, as defined. Subject to certain exceptions not relevant to this case, that definition includes *anyone* who acquires title to a residence in foreclosure. (§ 1695.1, subd. (a).)

The Legislature has told us to liberally construe the Act to effect its intent and achieve its purposes. (§ 1695, subd. (d)(2).) Construing the term "equity purchaser" liberally to encompass purchasers like McBride furthers the intent and purposes of the Act to safeguard the home equities of California homeowners; encourage fair dealing in the sale of distressed residences; restrict unfair contract terms; provide homeowners with the necessary information to make an intelligent decision about selling their home; and afford them meaningful opportunity to rescind. (§ 1695, subd. (d)(1).) Thus, whether or not an equity purchaser has an evil intent, whether or not an equity purchaser routinely purchases distressed homes, and whether or not it is the equity seller who first asks for help, the statute requires certain things from those who acquire title to another's residence when that residence is subject to an outstanding notice of default.

McBride was an equity purchaser not because she was an unscrupulous person engaged in the business of buying home equities at a discount, but because she acquired title to Segura's residence while that residence was in foreclosure. Segura did not receive one penny for his equity, and eventually McBride's son was able to turn a handsome profit on the property. There was an understanding that Segura retained a right to reacquire title to the property, whether under conditions (McBride's story) or not (Segura's story), yet McBride conveyed the property summarily without notifying Segura. Her son then upped the "rent," refused Segura's tender and eventually

precipitated his vacating the premises. Segura lost his home and his equity based on agreements and understandings that were never reduced to writing. This is the very situation which the Act intends to prevent.

■ Segura was entitled to actual damages because McBride did not satisfy the statutory mandates. She did not offer him a written contract, with appropriate terms, notices and disclosures. (§ 1695.6, subd. (a).) Although she claimed he had a right to repurchase the property if he performed by paying rent and coming up with funds to cash her out, this repurchase right was never reduced to writing and she granted an interest in the property to her son and granddaughter without Segura's consent. (§ 1695.6, subd. (e).)

## C. *Damages*

McBride next argues that the trial court erroneously valued Segura's damages at the 1986 and 1988 resale dates rather than the 1982 date of initial transfer.[9] Section 1695.7 entitles the equity seller to bring an action for damages within four years of the date of the alleged violation. Rescission is also available where the equity purchaser takes unconscionable advantage of the property owner in foreclosure. (§ 1695.13.) The court specifically found that unconscionable advantage had been taken of Segura, and ruled that he was entitled to rescission or, in the alternative, to damages. As it turned out, rescission was not available because the property had transferred to the hands of a bona fide purchaser for value.[10] (§ 1695.4, subd. (c).)

■ We agree with McBride that damages based on the homeowner's lost equity should be assessed as of the date of the violation.[11] The Act provides the equity seller with a damage remedy so that he or she can recoup actual damages stemming from the violation. When it is "lost" equity that is

---

[9]After a separate hearing on damages and additional correspondence on the matter, the trial court issued a statement of decision which set forth its method of computing damages, as follows: "The sale of the subject property from defendants McBride to Walfield (1986) for a profit to McBride in the sum of $36,900.00, and the additional sale of a portion of the subject property from McBride to Wayne (1988) for a profit in the sum of $21,000.00 for a total of $57,900.00. [¶] It is the judgment of the Court that defendants pay to plaintiff damages in the sum of $57,900.00, less an encumbrance paid by defendants in the sum of $16,308.00, for a total of $41,592.00, said sum bearing interest at the rate of ten percent (10%) from the date of filing of the complaint (October 29, 1986) . . . ." Thereafter the court entered judgment in Segura's favor for that amount.

[10]Rescission must be sought within two years of the date of recordation of the deed. (§ 1695.14, subd. (a).) Here the Segura to McBride deed was recorded November 2, 1982. McBride waived the statute of limitations defense to Segura's claim for rescission.

[11]Segura lost his equity in 1982 when he transferred all his property to McBride. McBride offered evidence that the market value of the property in 1982 was $30,172. On Segura's residential loan application which he submitted to the Bank of Loleta in January 1982, he set the market value at $50,000. Whatever the true value, his equity interest in 1982 would be

sought, by definition the equity is valued at the very precise point in time when it is lost to someone else. Once a homeowner loses his or her equity through an unfair transfer or sale, there is no more equity in the hands of the equity seller to be valued. One intent of the Act is to prevent below market sales on the eve of foreclosure. (§ 1695, subd. (a).) That goal is achieved by valuing the homeowner's true equity at the time of transfer or sale to the equity purchaser.

If an equity seller seeks lost appreciation, proof of damages proximately caused by the violation would have to include proof that he or she would have a colorable chance of holding onto the property in order to realize the appreciation. Remember, by definition the equity seller is facing foreclosure. Here, Segura testified that a Mr. Tony Leonardo had offered to buy the lot from him at the time he offered it to McBride, *but he did not trust him.* This evidence, without more, is insufficient to sustain a claim for appreciation beyond the transfer date.

■ Finally, if the equity seller seeks damages for breach of his repurchase rights, those damages should be assessed at the time the equity purchaser transfers the property without obtaining the seller's written consent, in violation of section 1695.6, subdivision (e).

In this case, in addition to the undisputed failure to provide a written contract with proper notices and terms (§ 1695.6, subd. (a)), which violation occurred in November 1982, there was conflicting evidence on the nature and extent of Segura's repurchase rights. The trier of fact could find Segura had a legitimate right which McBride violated by transferring an interest in the property without his written consent (§ 1695.6, subd. (e)). These transfers occurred in November 1984 and June 1985, when McBride transferred interests to her son and granddaughter.[12] As with lost equity, the damages for violation of a repurchase right should be measured as of the time of the violation. The measure of damages in this instance would be the difference between the value of the property at the time of breach and the repurchase price, plus other actual damages according to proof. (This measure is akin to damages for breach of agreement to convey real property. These damages consist of the sum of: (1) the cost and expense of examining title and preparing necessary papers; (2) the *difference between agreed price and value of the property at the time of breach*; (3) expenses incurred in preparing to enter the land; and (4) *consequential damages according to proof.* (§ 3306.)

The trial court found a section 1695.6 violation, but did not specify which particular subsections formed the basis of its conclusion. ■ It, in

---

calculated by subtracting the debt owing at the time of his deed to McBride from the market value. The record is unclear as to how much was owing on the property at that time.

[12]Segura offered some evidence that the property was worth $50,000 in 1984.

effect, awarded Segura damages for lost appreciation measured by the difference between the 1986 and 1988 market (resale) price and the debt paid by McBride prior to her donative transfer to her son and granddaughter. This measure was improper based on the state of the evidence on the issue of Segura's ability to prevent foreclosure and retain ownership so as to reap the benefits of four to six years of appreciation. The actual calculation was also in error because it did not account for the remainder of the Dilleshaw debt which Jon McBride and his daughter took subject to upon taking title to the property.

We reverse the judgment as to damages only and remand for further proceedings. On retrial of the damages issue, the court should make specific findings as to which violation or violations occurred, as well as the appropriate date for assessing damages.

### D. *Prejudgment Interest*

McBride finally maintains that any award of prejudgment interest would be improper in this case. We disagree.

■ First, it is helpful to identify the proper authority for awarding prejudgment interest. Section 3288 provides for prejudgment interest in actions other than contract: "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud or malice, interest may be given, in the discretion of the jury."[13] The party seeking interest under this statute need not prove both a breach of a noncontractual obligation as well as oppression, fraud or malice. (21 Cal.3d at p. 814.) Moreover, the trier of fact may award prejudgment interest even if plaintiff's damages are not liquidated. (*Ibid.*)

On the other hand, section 3287, subdivision (a), pertains to prejudgment interest on damages certain or capable of certainty through calculation (i.e., liquidated damages). Subdivision (b) of section 3287 pertains to contract damages for unliquidated contract claims.

■ Segura's claim was for unliquidated damages on an action other than contract and, thus, comes within the purview of section 3288. His damages (other than those related to storing his personal property, which the trial court did not award) remained to be ascertained and settled through the trial process. The cases which McBride mentions concerning when prejudgment interest begins to run on liquidated claims are therefore inapposite.

---

[13]When the trial court acts as trier of fact it, too, has discretion to award prejudgment interest under this section. (*Bullis* v. *Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 814, fn. 16 [148 Cal.Rptr. 22, 582 P.2d 109].)

McBride states that if a party does not specifically request prejudgment interest at trial, he or she waives any right to this element of damages, citing *Dixon Mobile Homes, Inc.* v. *Walters* (1975) 48 Cal.App.3d 964, 974 [122 Cal.Rptr. 202] (overruled on another point in *Bullis* v. *Security Pac. Nat. Bank, supra,* 21 Cal.3d at p. 815, fn. 18). *Dixon* does not say this. Rather, it holds that in the absence of a specific request for instructions on the jury's ability to award interest, the court has no duty to deliver such instructions.

The purpose of prejudgment interest is to compensate plaintiff for loss of use of his or her property. (*Bullis* v. *Security Pac. Nat. Bank, supra,* 21 Cal.3d at p. 815.) In his complaint Segura included a general request for "such other and further relief as the Court deems just and proper." This prayer is sufficient for the court, on its own, to invoke its power to levy such prejudgment interest as it deems just and equitable.

The judgment is affirmed in part and reversed in part. Parties to bear their own costs on appeal.

Perley, J., and Reardon, J., concurred.