[No. A119437. First Dist., Div. Two. Nov. 24, 2008.]

ALANNA SPENCER, Plaintiff and Respondent, v.
RYAN MARSHALL, Defendant and Appellant.

784

786

## Counsel

Law Office, James Lee Hand for Plaintiff and Respondent.

James E. Toothman & Associates, James E. Toothman and Joel F. Donahoe for Defendant and Appellant.

## Opinion

**LAMBDEN, J.**—Alanna Spencer filed a chapter 13 bankruptcy and, one year into her bankruptcy, the lender on her home mortgage requested relief from the automatic stay. While this motion was pending in the bankruptcy court, Spencer signed a contract to sell her home for less than the appraised value to Ryan Marshall, a licensed real estate broker. She also signed a leaseback and one-year option to repurchase the home at a price higher than the current sale

price. At the end of the year, Spencer could not afford to purchase the home; Marshall filed an unlawful detainer action against Spencer to have her evicted from the home. Spencer sued Marshall for violating Civil Code section 1695 et seq.,[1] the Home Equity Sales Contracts Act (HESCA or the Act).

After a court trial, the judge ruled that Marshall was an equity purchaser and Spencer was an equity seller and therefore the transaction came under the protections of HESCA. The court determined that Marshall had violated HESCA and awarded Spencer monetary and exemplary damages. Marshall appeals, arguing that he is not an equity purchaser and is exempted from the requirements of the Act under section 1695.1, subdivision (a)(4) and (5). We disagree with Marshall's interpretation of the statute, and affirm the lower court's judgment.

## BACKGROUND

*Spencer Purchases a Home and Later Files for Bankruptcy*

In 1998, Spencer, a first time homebuyer, bought a two-bedroom condominium in Hayward. Spencer became delinquent on her mortgage payments to her lender, Option One Mortgage Corporation (Option One), and Option One recorded a notice of default and election to sell under deed of trust on November 25, 2002. Spencer contacted bankruptcy attorney David A. Boone, and filed a chapter 13 petition on January 8, 2003.

The confirmed plan filed on January 8, 2003, in the bankruptcy court stated the following: "The debtor(s) elect to have property of the estate revest in the debtor(s) upon plan confirmation. Once the property reverts, the debtor(s) may sell or refinance real or personal property without further order of the court, upon approval of the Chapter 13 Trustee." On March 12, 2003, the bankruptcy court issued an order confirming Spencer's chapter 13 plan, finding that it complied with the provisions of chapter 13, title 11, of the United States Code.

Spencer still owed $170,000 on her home and she fell behind in her postbankruptcy payments to Option One. At some point, Option One filed a motion in the bankruptcy court requesting relief from the automatic stay to enforce its interest in the property.

---

[1] All further unspecified code sections refer to the Civil Code.

*The Contracts Between Spencer and Marshall*

Spencer received a mail solicitation from DirectLender, a mortgage company, which stated "payoff your bankruptcy early." DirectLender made money arranging home loans for people in bankruptcy. Marshall had been president of DirectLender.

Spencer sought to refinance her property with the assistance of DirectLender; an appraisal completed as part of the process valued the property at $290,000. When the refinancing could not be completed, DirectLender, according to Spencer, referred her to Marshall, a licensed real estate broker and the owner and president of IRES, a financing company; he was also the co-owner of Innovative Real Estate Strategies, LLC (Innovative).[2]

Spencer contacted Marshall's office and told Marshall's staff that she needed $220,000 to pay her creditors through bankruptcy. On August 10, 2004, Marshall provided Spencer with a standard California Association of Realtors residential purchase agreement for the sale of her home for $220,000 to Marshall "[a]nd or Assignee." Marshall also presented to Spencer for signature a one-year leaseback agreement for $1,500 per month[3] and an option agreement that stated Spencer could repurchase her condominium for $260,000 anytime from October 1, 2004, until September 1, 2005, at which time the option would expire.

Attached to the contract for the sale of Spencer's home was a "Controlled Business Arrangement Disclosure Statement" and an "Addendum to Purchase Agreement." The former document stated that "Innovative Real Estate Strategies/Sisu Management Inc./IRES Co., Ryan Marshall Division" was assisting Spencer "in the purchase, sale, and or creative strategy for [her property]." The addendum contained the following provision, among others: "Seller is aware and understands that the present fair market value of the property may be higher than the purchase price set forth herein. Seller hereby expressly waives any and all claim to any potential or actual income. Profits, or other sums in excess of the purchase priced [*sic*] agreed upon, which may be realized by buyer or others [*sic*] result of any transaction of the property. Seller acknowledges that the purchase price stated in the purchase agreement is fair and equitable and is in the best interest of the seller, and it is the sellers [*sic*] decision to sell was not made in reliance on any representations of buyer which is not expressly contained in this disclosure or purchase agreement." The addendum also provided the following: "The 'Tenant' will rely solely

---

[2] According to Marshall, Innovative and IRES are two separate companies.

[3] The rent charged to Spencer was actually higher than the Option One monthly mortgage payment on which Spencer had defaulted. This amount of $1,500 covered all of Marshall's costs plus an extra $200 for a monthly management fee for Lisa Sanderson.

upon the advice of his or her own counsel <u>before</u> entering into such agreement. . . . The tenant shall not rely [on] any other information but that received by the professional of his/her choice. . . ."

Spencer reviewed these documents with her bankruptcy counsel, Boone. Spencer knew that the sale price was less than the appraisal and that the repurchase price was higher than the sale price. Spencer did not request any changes or modifications to any of the agreements. The bankruptcy court was about to lift its stay on Option One's foreclosure proceedings, and Spencer testified that she was "depressed" and "terrified." She stated that she believed the situation was "urgent" and that "someone would come and padlock the front door and that would be it."

*The Sale and the Bankruptcy Court*

On August 30, 2004, the bankruptcy court issued an order, effective on and after September 20, 2004, granting Option One's motion for relief from the automatic stay to enforce its interest in the property. The court stated that this "order shall be effective on and after September 20, 2004."

On September 10, 2004, Martha G. Bronitsky, the bankruptcy trustee in Spencer's bankruptcy case, sent a letter to California Sunset Escrow regarding Spencer. Bronitsky stated that she understood that an escrow had been opened and that through this transaction it would satisfy the debts to Spencer's named secured creditors. This letter constituted her approval of the sale pursuant to Spencer's chapter 13 plan. Bronitsky testified that her only concern was whether the sale would generate enough money to pay off the liens on the property and pay the unsecured creditors their 13 cents on the dollar. She was not concerned with the question of Spencer's receiving a fair price.

On September 15, 2004, escrow closed and Spencer signed a grant deed transferring her property to Lisa Sanderson. Sanderson was Marshall's assignee under the purchase agreement and, according to Marshall, the co-owner of Innovative. Subsequently, Sanderson transferred title to Innovative, although Sanderson indicated on the loan application that she intended to occupy the property as her second home. Both Sanderson and Marshall admitted at trial that they knew this statement regarding Sanderson's intent to live on the property was false, but listing it as being personally occupied permitted IRES to sell the loan at a higher price.

On November 5, 2004, Bronitsky filed a notice of plan completion with the bankruptcy court, recommending discharge of Spencer's debts because the chapter 13 plan had been completed pursuant to bankruptcy law and all

required disbursements had been made. On November 11, 2004, the bankruptcy court issued an order finding that Spencer had fulfilled her requirements under the chapter 13 plan, and discharging her debts in bankruptcy.

*Spencer's Inability to Buy Back the Home and Her Eviction*

Spencer continued to reside at the Hayward property pursuant to the lease agreement. On May 4, 2005, Spencer wrote a letter to Sanderson, asking that her monthly rent be reduced to $1,300, with the accumulated $200 monthly balance to be added to the $260,000 repurchase price under the option agreement. Marshall, on behalf of Innovative, agreed to this request.

On June 27, 2005, Marshall sent a letter to Spencer enclosing a notice to pay rent or quit, notifying her that rent for the month of June was past due. At some point before August 11, 2005, Spencer contacted First Financial Plus to try to arrange a loan to repurchase the property. According to Spencer, First Financial Plus advised her that she could not qualify for a loan without a "gift of equity" from Marshall. When Spencer learned that Marshall would not renegotiate the option agreement to provide her with a gift of equity, Spencer wrote a letter to Marshall dated August 11, 2005, stating: "For me the deception is that when I entered into this agreement almost one year ago, I was told that you would work with me on the financing."

Spencer did not repurchase the Hayward residence by September 1, 2005, the date when the option agreement expired. Marshall wrote to Spencer and asked her if she would be willing to repurchase her property for $315,000. Spencer said that she could not pay that much; Marshall listed the property for sale for $369,950.

On October 27, 2005, Marshall served Spencer with a 60-day notice to terminate the tenancy. Spencer served a notice of rescission.

*The Complaints Filed in Superior Court*

On December 15, 2005, Spencer filed her complaint to quiet title and for compensatory and punitive damages against Marshall and others. She alleged that Marshall violated HESCA when taking title to her condominium. On February 3, 2005, she filed a first amended complaint against IRES, Sanderson, Marshall, and two other companies[4] to quiet title and for specific performance, compensatory damages, and punitive damages. In her first cause of action against Sanderson, Spencer sought rescission of the purchase

---

[4] Prior to trial, Spencer dismissed her complaint against SISU Management Inc., and Mortgage Electronic Registration Systems, Inc.

agreement and to quiet title to the property. She alleged that the form and content of the purchase agreement did not conform with the requirements of HESCA under sections 1695.3 and 1695.5. In her third and fifth causes of action against Marshall and Sanderson, she requested actual and punitive damages, alleging that they transferred and encumbered the property in violation of HESCA under section 1695.6.[5]

On January 4, 2006, Innovative filed a complaint in unlawful detainer against Spencer.

On March 6, 2006, the trial court consolidated the unlawful detainer action with Spencer's action. On November 14, 2006, the court ordered the trial bifurcated with a bench trial of the HESCA claims to be heard first.

At the court trial, Bronitsky, Marshall, and Spencer testified. After hearing their testimony and arguments, the trial court issued its statement of decision on August 16, 2007. The court rejected the argument that HESCA did not apply. The trial court noted that Marshall and Sanderson could not both be equity purchasers. It determined that Marshall, not Sanderson, was liable for the violations of HESCA because he was the person who structured the terms of the transaction and had the primary dealings with Spencer regarding the property. The court found that Marshall violated section 1695.6, subdivisions (a), (b)(3), and (e).

The court concluded: "In sum, the evidence presented at trial shows that Marshall, through his contacts at DirectLender, was looking to find people in financial distress, in particular, homeowners in bankruptcy like Spencer. Despite Marshall's reluctance at trial to admit that at the time he entered into the transaction with Spencer he knew that a notice of default had been recorded against the property, the court has no doubt that Marshall was fully aware that he was buying Spencer's residence on the eve of foreclosure and that he used this circumstance to his own advantage to get a price well below market value. Moreover, even though Marshall knew that Spencer had come to him because she had been unable to qualify for a $220,000 loan, he misled her into believing that by selling the property to him and getting out of bankruptcy, she could then afford, with his help in obtaining financing, to buy back her home. [¶] At least as to their dealings with Spencer, defendants were in every respect the 'archetypal predators' that HESCA seeks to regulate."

---

[5] Spencer's second cause of action requested specific performance of her repurchase option under the option agreement. Her fourth cause of action sought alternative money damages in the amount of $50,000 pursuant to an alleged promise by Marshall to pay her that amount in return for her cooperating with the attempted sale of the property. After the first phase of the trial, Spencer dismissed these causes of action.

The trial court set forth three possible remedies and Spencer chose monetary damages against Marshall.[6] Subsequently, Innovative dismissed its unlawful detainer complaint against Spencer.

The trial court filed its amended judgment on September 20, 2007. The court entered judgment in favor of Spencer on counts 1, 3, and 5 of her first amended complaint. It awarded her monetary damages against Marshall in the amount of $280,000, representing the sum of actual damages of $70,000 and exemplary damages of $210,000. Pursuant to a stipulation of the parties, the award was reduced by $27,300 for unpaid rent, for a net recovery of $252,700. Despite finding no liability for the purposes of a damages award against Sanderson and IRES, the court concluded that they were necessary parties to the action given the alternative remedies available and therefore it found Spencer to be the prevailing party against all of defendants for the purpose of awarding attorney fees.

Marshall filed a timely notice of appeal.

## DISCUSSION

On appeal, Marshall contends that Spencer's sale of the property to Sanderson as his assignee was outside the scope of HESCA. HESCA applies only to an equity purchaser and this sale, according to Marshall, falls under the exceptions to an equity purchaser as set forth in section 1695.1, subdivision (a)(4) and (5).

### I.   *Standard of Review*

Marshall maintains that this appeal concerns the interpretation of a statute as it applies to undisputed facts and therefore our review is de novo. (See, e.g., *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956].) We agree that most of the essential facts are undisputed and we review de novo our determination of the applicability of HESCA to these undisputed facts. (24 Cal.4th at p. 432.)

To the extent that Marshall challenges the lower court's factual findings, we apply the substantial evidence standard of review. " 'When a finding of fact is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted,

---

[6] Other options that Spencer rejected were rescission of the purchase agreement and restoration of title to the property to Spencer, subject to an equitable mortgage to Innovative for the sum of $202,827.

which will support the finding of fact. [Citations.] [¶] When two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court.' " (*Scott v. Common Council* (1996) 44 Cal.App.4th 684, 689 [52 Cal.Rptr.2d 161], quoting *Green Trees Enterprises, Inc. v. Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 784–785 [59 Cal.Rptr. 141, 427 P.2d 805].) The testimony of a single credible witness may constitute substantial evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479].)

## II. *The Relevant Statutes and the Policy Underlying Them*

The purpose underlying the Legislature's enactment of HESCA is set forth in section 1695. Section 1695 provides in relevant part:

"(a) The Legislature finds and declares that homeowners whose residences are in foreclosure have been subjected to fraud, deception, and unfair dealing by home equity purchasers. . . . During the time period between the commencement of foreclosure proceedings and the scheduled foreclosure sale date, homeowners in financial distress, especially the poor, elderly, and financially unsophisticated, are vulnerable to the importunities of equity purchasers who induce homeowners to sell their homes for a small fraction of their fair market values through the use of schemes which often involve oral and written misrepresentations, deceit, intimidation, and other unreasonable commercial practices.

"(b) The Legislature declares that it is the express policy of the state to preserve and guard the precious asset of home equity, and the social as well as the economic value of homeownership.

"(c) The Legislature further finds that equity purchasers have a significant impact upon the economy and well-being of this state and its local communities, and therefore the provisions of this chapter are necessary to promote the public welfare.

"(d) The intent and purposes of this chapter are the following:

"(1) To provide each homeowner with information necessary to make an informed and intelligent decision regarding the sale of his or her home to an equity purchaser; to require that the sales agreement be expressed in writing; to safeguard the public against deceit and financial hardship; to insure, foster, and encourage fair dealing in the sale and purchase of homes in foreclosure; to prohibit representations that tend to mislead; to prohibit or restrict unfair

contract terms; to afford homeowners a reasonable and meaningful opportunity to rescind sales to equity purchasers; and to preserve and protect home equities for the homeowners of this state.

"(2) This chapter shall be liberally construed to effectuate this intent and to achieve these purposes."

■ In *Segura v. McBride* (1992) 5 Cal.App.4th 1028 [7 Cal.Rptr.2d 436] (*Segura*), this court explained that HESCA seeks to regulate transactions between an equity purchaser and an equity seller resulting in the sale of residential real property in foreclosure. The Act sets forth a number of requirements aimed at protecting the homeowner (§§ 1695.2–1695.6). "The contract must include the total consideration given, terms of payment and terms of any rental agreement; a conspicuous statement of the right to cancel within five business days or until 8 a.m. on the day scheduled for foreclosure, with an attached notice of cancellation; and a conspicuous notice that until the right to cancel has ended, the equity purchaser cannot ask the seller to sign a deed or any other document. (§§ 1695.3–1695.5.) The equity purchaser must provide, and complete, the contract in conformity with these terms. (§ 1695.6, subd. (a).) [¶] During the 'cooling off' period, the equity purchaser cannot take title to the property by written instrument or recordation thereof; transfer or encumber any interest in the property; or pay the seller any consideration. (§ 1695.6, subd. (b).) Moreover, the purchaser cannot make untrue or misleading statements about the value of the property, any foreclosure proceeds, or the terms of sale. (§ 1695.6, subd. (d).) Additionally, when the seller grants the residence by an instrument purporting to be an absolute conveyance but reserves or is given an option to repurchase, the equity purchaser cannot grant any interest in the property to another without the written consent of the seller. (§ 1695.6, subd. (e).) Finally, it is unlawful to take unconscionable advantage of the property owner in foreclosure. (§ 1695.13.)" (*Segura, supra*, 5 Cal.App.4th at pp. 1035–1036, fns. omitted.)

■ The Act is intended to have broad application. "While the archetype prompting the Legislature to regulate the field of equity purchases may well have been the business person who seeks out and preys upon distressed homeowners, the resulting legislation embraced a broader class of persons in order to systematically protect homeowners from the unfair loss of the precious asset of home equity. Thus, the Act regulates not only the archetypal predator, but *all* equity purchasers, as defined." (*Segura, supra*, 5 Cal.App.4th at p. 1037.)

■ An equity seller is "any seller of a residence in foreclosure." (§ 1695.1, subd. (c).) An " '[e]quity purchaser' means any person who acquires title to

any residence in foreclosure . . . ." (*Id.*, subd. (a).) HESCA sets forth six exceptions to the definition of an equity purchaser, which include a person "who acquires such title as follows: [¶] . . . [¶] (4) At any sale of property authorized by statute. [¶] (5) By order or judgment of any court." (§ 1695.1, subd. (a).)

Here, it is undisputed that Spencer's home was in foreclosure and Marshall does not challenge the lower court's findings that the sale did not comply with HESCA. Marshall, however, maintains that the Act did not apply to the purchase of Spencer's property, and asserts that the exceptions set forth in section 1695.1, subdivision (a)(4) and (5) applied to the sale. We consider whether either of these exceptions applies.

### III.   *The Exemption Under Section 1695.1, Subdivision (a)(4)*

As already stated, a purchaser is exempt from the requirements of HESCA when the person acquires title: "At any sale of property authorized by statute." (§ 1695.1, subd. (a)(4).) Marshall contends that the sale was authorized by the bankruptcy statutes.

In particular, Marshall sites section 363 of the United States Bankruptcy Code (11 U.S.C.), which states, "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." (11 U.S.C. § 363(b)(1).) Further, "[s]ubject to any limitations on a trustee under this chapter, the debtor shall have, exclusive of the trustee, the rights and powers of a trustee under sections 363(b) . . . of this title." (11 U.S.C. § 1303.) Section 105 provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. . . ." (11 U.S.C. § 105(a).)

Marshall concedes that Spencer's sale of the property did not proceed after notice to the creditors and a hearing as required by section 363(b)(1) of the Bankruptcy Code (11 U.S.C. § 363(b)(1)). However, he emphasizes that Bronitsky testified at trial that the Oakland Bankruptcy Court has a local procedure, which permits debtors to sell their property upon approval of the trustee without a noticed hearing or further court order. Marshall further notes that Spencer's chapter 13 plan confirmed this when it stated as follows: "The debtor(s) elect to have property of the estate revest in the debtor(s) upon plan confirmation. Once the property revests, the debtor(s) may sell or refinance real or personal property without further order of the court, upon approval of the Chapter 13 Trustee." Marshall argues that Spencer's sale of the property to Sanderson as Marshall's assignee, as approved by Bronitsky, was authorized by Bankruptcy Code sections 363(b)(1), 1303, and 105(a). (11 U.S.C. §§ 363(b)(1), 1303, 105(a).) We disagree.

■ The Bankruptcy Code permits the seller to sell the property with the approval of the trustee, but it does not mandate a sale. We, however, do not need to consider whether the exemption is limited to those situations where the statute directly, rather than indirectly, authorizes the sale because we conclude the exception does not apply in the present case under the express language of section 1695.1, subdivision (a)(4).

■ Our task in construing a statute is to ascertain the legislative intent to permit us to effectuate the purpose of law. (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715 [3 Cal.Rptr.3d 623, 74 P.3d 726].) The statutory language ordinarily is the most reliable indicator of legislative intent. (*Ibid.*) We give the words of the statute their ordinary and usual meaning and construe them in the context of the statute as a whole and the entire scheme of law of which it is a part. (*State Farm Mutual Automobile Ins. Co. v. Garamendi* (2004) 32 Cal.4th 1029, 1043 [12 Cal.Rptr.3d 343, 88 P.3d 71].) If the language is clear and a literal construction would not result in absurd consequences that the Legislature did not intend, the plain meaning governs. (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563].) If the language is ambiguous, we may consider a variety of extrinsic aids, including the purpose of the statute, legislative history, and public policy. (*Ibid.*)

■ We conclude that the clear language of section 1695.1, subdivision (a)(4), does not apply to the present sale. HESCA excludes from its coverage a purchaser acquiring title: "*At* any sale of property authorized by statute." (§ 1695.1, subd. (a)(4), italics added.) The Legislature purposefully started the phrase with the preposition "at." The dictionary defines "at," as relevant here, as denoting a location or position. (Dictionary.com Unabridged (vol. 1.1) [based on Random House Unabridged Dict. (2006)] <http://dictionary.reference.com/browse/at> [as of Nov. 24, 2008].) Thus, the purchaser must bid or purchase the property at a sale authorized by statute. For example, a purchase of property at a government sale due to unpaid taxes would fall under this exception. Neither Marshall nor Sanderson purchased Spencer's property "[*a*]*t* any sale of property authorized by statute" (§ 1695.1, subd. (a)(4), italics added). Section 1695.1, subdivision (a)(4) therefore does not apply.

In his reply brief, Marshall argues that the Legislature would have inserted limiting language had it intended to restrict the provision to a particular type of sale. He asserts that the doctrine of *ejusdem generis* provides that where a general term or category follows or precedes an enumeration of particular classes of things, the general term is restricted to those specifically enumerated. (See *International Federation of Professional and Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 Cal.4th 319, 342 [64

Cal.Rptr.3d 693, 165 P.3d 488] [The doctrine of *ejusdem generis* applies to Pen. Code, § 832.8, which specifies that " 'personnel records' means any file maintained under that individual's name by his or her employing agency and containing records relating to any of the following: [¶] (a) Personal data . . . . [¶] (b) Medical history."].) This argument makes little sense because section 1695.1 sets forth exceptions to a general term; it is not a statute that enumerates particular classes of things after the general term. In any event, Marshall ignores the fact that the exception in section 1695.1, subdivision (a)(1) begins with the preposition "at" and therefore the exclusion does not apply to all sales authorized by statute. Indeed, Marshall's construction of the exclusion under section 1695.1, subdivision (4) would result in numerous sales avoiding the HESCA protections since most sales are indirectly authorized by statute.

Marshall argues that his interpretation is consistent with the policy underlying HESCA and that fairness is not a primary concern because that would not explain the other exceptions to an equity purchaser, such as property acquired from a family member (§ 1695.1, subd. (a)(6)) or purchased for one's own personal residence (*id.*, subd. (a)(1)). Further, he emphasizes that Spencer was protected by the automatic bankruptcy stay against any potential foreclosure by her creditors and that she had all the information necessary to make an informed and intelligent decision regarding her sale of the property. Additionally, Marshall points out that Spencer reviewed the agreement with her bankruptcy attorney. Marshall claims that he was not an archetypal foreclosure vulture and that his primary business was as the president of IRES, a loan-making finance company. He states that he purchased properties from homeowners in bankruptcy on only two or three other occasions.

■ Marshall may complain that some of the other exceptions to the definition of an equity purchaser under the Act are too broad and not based on principles of fairness, but it is clear that HESCA was enacted to protect owners of residence in foreclosures from fraud, deception, and unfair dealings by home equity purchasers. (§ 1695, subd. (a).) The intent of HESCA is "[t]o provide each homeowner with information necessary to make an informed and intelligent decision regarding the sale of his or her home to an equity purchaser; to require that the sales agreement be expressed in writing; to safeguard the public against deceit and financial hardship; to insure, foster, and encourage fair dealing in the sale and purchase of homes in foreclosure; to prohibit representations that tend to mislead; to prohibit or restrict unfair contract terms; to afford homeowners a reasonable and meaningful opportunity to rescind sales to equity purchasers; and to preserve and protect home equities for the homeowners of this state." (§ 1695, subd. (d)(1).)

The bankruptcy process does not provide any of the safeguards present in HESCA. As trustee Bronitsky testified, her approval of the sale of the

property was based only on the fact that the sales price would pay off Spencer's bankruptcy debts; Bronitsky was not concerned with whether Spencer would be receiving a fair price. To interpret the HESCA in the manner urged by Marshall would deprive all persons filing for bankruptcy of the protections of HESCA.

Further, Marshall's rendition of the facts is contrary to the findings of the lower court. The lower court's findings were that Spencer was precisely the type of seller that was the focus of the Act. At the time DirectLender referred Spencer to Marshall, Option One was contacting her regularly to bring her mortgage payments current. Moreover, her attempt to refinance the property had failed and the bankruptcy court was about to lift its stay on the lender's foreclosure proceedings. Spencer testified that she believed the situation was "urgent" when she saw Marshall and that she "was terrified." She stated that she "envisioned that someone would come and padlock the front door and that would be it." The court found Spencer's version of what happened more credible than Marshall's rendition. Spencer stated that she saw Marshall's offer as the only way she could remain in her home and testified that Marshall misled her into believing that, by selling the property to him and getting out of bankruptcy, she could afford, with his help in obtaining financing, to buy back her home within a year. The court concluded that Spencer was especially vulnerable to Marshall's predatory tactics. We conclude that the record amply supported the lower court's findings that Spencer was vulnerable and susceptible to Marshall's promises that he could help her.

■  The Legislature set forth narrow exclusions to the Act and we do not agree with Marshall that public policy supports excluding from the protection of HESCA those foreclosures where the seller is in chapter 13 bankruptcy.[7] When considering the language of the Act, we narrowly construe the exceptions. (See § 1695, subd. (d)(2) ["(2) This chapter shall be liberally construed

---

[7] Both parties cite to a bankruptcy court order that involved the parties in *Banks v. Manos* (1991) 232 Cal.App.3d 123 [283 Cal.Rptr. 318]. The appellate decision has no relevance to the issue before us. *Banks* involved the plaintiff's petition for writ of mandate; the plaintiff was seeking to stay the enforcement of the money judgment without bond after the trial court had granted the defendants' summary judgment motion. The appellate court agreed with the lower court that the automatic stay did not apply and therefore the judgment had to be bonded. (*Id.* at pp. 125–126.) Spencer requested that the lower court take judicial notice of the bankruptcy court's order involving the parties in *Banks*, which the lower court granted. The order provided that "the debtor has the court's authorization to encumber the real property . . . provided that the amount of the encumbrance not exceed the amount of $20,000, and further, that debtor has the court's authorization to transfer a forty-five percent interest in the said real property." Marshall responds that the bankruptcy order did not mandate or compel a sale but, similarly to the present case, simply authorized the sale. Further, Marshall asserts that the order did not involve a determination of fairness to the debtor. This bankruptcy court order is not helpful to either party as it contains *absolutely no analysis* and there is no indication that the court even considered the issue presented here.

to effectuate this intent and to achieve these purposes."].) Marshall's interpretation contradicts this requirement as it would essentially exclude from coverage all sales involving people filing for bankruptcy. Moreover, as already stressed, Marshall's interpretation completely ignores that the exclusion in section 1695.1, subdivision (a)(4) begins with the preposition "at."

Accordingly, we conclude that Sanderson, as Marshall's assignee, was an equity purchaser under HESCA and therefore the safeguards of this Act applied to the purchase of Spencer's home.

## IV. *The Exemption Under Section 1695.1, Subdivision (a)(5)*

Marshall contends that the exemption under section 1695.1, subdivision (a)(5) applies. This provision states that an equity purchaser for the purposes of the Act is not a purchaser who acquires title "[b]y order or judgment of any court." Marshall claims that Spencer's chapter 13 plan stated that she could sell the property without further order of the court, subject to the approval of the trustee. Further, even if Spencer did not receive the trustee's approval, according to Bronitsky's testimony, Spencer could have filed a motion with the bankruptcy court for approval of a sale free and clear of liens. Marshall asserts that in either situation Spencer's sale of the property "was accomplished pursuant to the bankruptcy court's order authorizing such sale, and upon approval by Bronitsky under the terms of that order."

Marshall's interpretation is contrary to the express language of the statute. No court order or judgment ever directed the transfer of title of Spencer's property to Marshall or Sanderson.

Marshall maintains that Bronitsky testified that her approval was a substitute for a further court order and had the identical purpose and effect. Bronitsky's approval may have permitted Spencer to sell her property without filing a motion for a court order, but Bronitsky's approval was not a court order. As already emphasized, the trustee's approval did not require the same considerations that underlie the policy concern of HESCA, and the trustee was not concerned about the transaction's fairness to Spencer.

Spencer's right under the chapter 13 plan to sell or refinance her property without further order of the bankruptcy court, subject to the approval of the bankruptcy trustee, was not an order or judgment authorizing or directing her to sell the property to Marshall. Consequently, the exemption under section 1695.1, subdivision (a)(5) does not apply. Accordingly, Sanderson, as Marshall's assignee, was an equity purchaser and the sale of Spencer's home was subject to the requirements of HESCA.

## DISPOSITION

The judgment is affirmed. Marshall is to pay the costs of appeal.

Haerle, Acting P. J., and Richman, J., concurred.