[No. A124964. First Dist., Div. Five. Mar. 4, 2011.]

DANIEL J. CAPON, Plaintiff and Appellant, v.
MONOPOLY GAME LLC et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II., III., and IV.

**COUNSEL**

DLA Piper, Renee Glover Chantler, Marc Belloli and Rajiv Dharnidharka for Plaintiff and Appellant.

Richard Phelps for Defendants and Appellants.

**OPINION**

**SIMONS, J.**—The Home Equity Sales Contract Act (HESCA or the Act) (Civ. Code, § 1695 et seq.),[1] enacted in 1979, is designed to protect homeowners in default against unfair purchases of their home equity. The Act regulates transactions between an equity purchaser and an equity seller resulting in the sale of residential real property in foreclosure. Central to the legislative scheme is the requirement that the agreement between the buyer and seller be in writing and contain specific terms aimed at protecting the homeowner (§§ 1695.2, 1695.3, 1695.5). (*Segura v. McBride* (1992) 5 Cal.App.4th 1028, 1034–1036 [7 Cal.Rptr.2d 436] (*Segura*).)

---

[1] All further undesignated section references are to the Civil Code.

This case arises from a home equity purchase transaction involving plaintiff Daniel J. Capon (plaintiff) and defendants Sidney Gladney (Gladney), Monopoly Game LLC (Monopoly Game), Charles Prael (Prael), and Los Trancos Systems, L.L.C. (Los Trancos) (collectively, defendants). Following a bench trial, the trial court awarded plaintiff a total of $660,625.48 to compensate him for the home equity he lost in the transaction and for the conversion of his personal property. On appeal, defendants challenge the trial court's findings that the deed recorded on their behalf is void and that they are liable for conversion. Plaintiff cross-appeals, contending the trial court erred in concluding that the underlying sale transaction did not violate HESCA and in failing to hold defendants Prael and Los Trancos jointly and severally liable for a portion of the amount awarded to plaintiff for loss of his home equity.

In the published portion of this opinion we interpret section 1695.1, subdivision (a)(1),[2] which exempts from the definition of "equity purchaser" a person who acquires title to a residence in foreclosure "[f]or the purpose of using such property as a personal residence." We conclude the trial court erred in rejecting plaintiff's HESCA claim: section 1695.1(a)(1) is inapplicable because, although the trial court found defendant Gladney intended to live in plaintiff's house, the buyer was defendant Monopoly Game, not Gladney. In the unpublished portion of this opinion, we conclude the trial court erred in failing to hold defendants Prael and Los Trancos jointly and severally liable for a portion of plaintiff's lost home equity. We affirm the court's rulings that the recorded deed is void and defendants are liable for conversion. We remand for an award of attorney fees to plaintiff under HESCA and entry of an amended judgment in accordance with this opinion.

## BACKGROUND

In 1991, plaintiff purchased a house located on Woodridge Road in Hillsborough, California (the Property), for $1.31 million. Plaintiff lived at the Property with his two sons and later with his wife Miriam Siekevitz (Siekevitz). Plaintiff and Siekevitz encountered financial difficulties that ultimately resulted in a default on a second mortgage on the Property. In

---

[2] All further references to section 1695.1, subdivision (a) will be styled as section 1695.1(a).

Section 1695.1(a) provides: " 'Equity purchaser' means any person who acquires title to any residence in foreclosure, except a person who acquires such title as follows: [¶] (1) For the purpose of using such property as a personal residence. [¶] (2) By a deed in lieu of foreclosure of any voluntary lien or encumbrance of record. [¶] (3) By a deed from a trustee acting under the power of sale contained in a deed of trust or mortgage at a foreclosure sale conducted [under a specified statutory provision]. [¶] (4) At any sale of property authorized by statute. [¶] (5) By order or judgment of any court. [¶] (6) From a spouse, blood relative, or blood relative of a spouse." Defendants do not contend that exceptions (2) through (6) are applicable in this case.

October 2003, a notice of trustee's sale was recorded, setting November 14, 2003, at 1:00 p.m. as the date and time for the sale.

Gladney is the owner of Monopoly Game; the company's primary business in November 2003 was the purchase of residential properties in foreclosure. Prael is one of the owners of Los Trancos; in 2003, 75 to 80 percent of Los Trancos's business was related to foreclosure management.

On or around October 28, 2003, defendants became aware of the scheduled trustee's sale of the Property. Thereafter, plaintiff was approached by Prael at the County of San Mateo Recorder's Office. Prael represented that he was familiar with plaintiff's situation and offered to help him seek refinancing. Prael also came to the Property and left his business card, reiterating that he could help.

On the morning of November 14, 2003, the date set for the trustee's sale, Gladney and Prael visited plaintiff and Siekevitz at the Property. Plaintiff and Siekevitz agreed to sell Gladney their equity interest in the Property for $100,000, plus $50,000 if they moved out by December 15. Gladney instructed plaintiff and Siekevitz to go to Alliance Title Company in San Jose to complete the paperwork for the transaction. Plaintiff and Siekevitz signed a one-page "Agreement to Sell Real Property" (Agreement), a grant deed in favor of Monopoly Game (Deed), and a document entitled "Estoppel Affidavit." The Agreement was backdated to October 29, 2003.

The Deed, as executed by plaintiff and Siekevitz, purported to convey real property located in the "City of San Mateo," did not contain a street address or other description of the Property, and referenced a parcel number that is not the correct parcel number for the Property. Subsequently, the Deed was altered to change a reference from "San Mateo" to "Hillsborough" and to attach a new second page describing the Property (Altered Deed). Neither plaintiff nor Siekevitz consented to the alterations. The Altered Deed was recorded on December 3, 2003.

Subsequently, Monopoly Game sold the Property to David Salma (Salma) for over $1.5 million; the sale netted Monopoly Game over $300,000. For services related to the Property, Los Trancos was paid $70,000.

As relevant to plaintiff's conversion claim, at some point after sale of the Property to Monopoly Game, Gladney suggested to Siekevitz that she apply

for a restraining order against plaintiff; Gladney's lawyer provided the paperwork to Siekevitz. On December 10, 2003, two plainclothes police officers came to the Property and told plaintiff he had to leave. When plaintiff refused, he was arrested pursuant to the restraining order. The next day, plaintiff was allowed to return for 10 minutes with Staci Adams (Adams), who also lived at the Property, to gather what he could of his belongings. Most of plaintiff's belongings remained at the Property after that visit, including a $28,000 antique oriental rug and scientific equipment that plaintiff testified was worth more than $1 million. Adams testified that Prael told her that he would deliver her and plaintiff's remaining belongings to a warehouse. Prael failed to do so.[3]

On December 15, 2003, Siekevitz turned over to Gladney her keys to the Property. On December 17, Prael and workmen began removing plaintiff's personal property under instructions from Gladney to remove it all by December 19. Prael donated some of plaintiff's belongings and some of the scientific equipment; he valued the donations at $325,745. Prael disposed of nearly everything else.

Prior to filing the instant action, plaintiff recorded a notice of rescission under section 1695.14 of HESCA, seeking return of the Property. On December 2, 2005, plaintiff filed the present lawsuit against, among others, defendants and Salma (who purchased the Property from Monopoly Game). The complaint asserted 12 causes of action: (1) rescission under HESCA; (2) damages for violation of HESCA; (3) declaratory relief; (4) quiet title; (5) breach of contract; (6) fraud; (7) deceit; (8) conversion; (9) unjust enrichment; (10) civil conspiracy; (11) unfair business practices within the meaning of Business and Professions Code section 17200 et seq.; and (12) injunctive relief.[4]

The trial court conducted a bench trial and in February 2009 the court issued its final statement of decision and judgment. The court ruled in favor of plaintiff on the causes of action for declaratory relief, unjust enrichment, and unfair business practices, finding the Altered Deed was void *ab initio* because it lacked a legally sufficient property description when executed and was rendered a forgery when it was altered. As restitution, the trial court awarded plaintiff $306,880.48 (Monopoly Game's profits from resale of the

---

[3] There was testimony from Prael and his mother that they delivered some of plaintiff's property to him at a storage facility, but the trial court did not find that testimony credible.

[4] Plaintiff reached a settlement with Salma. Defendants Gladney and Monopoly Game filed a cross-complaint against plaintiff, Siekevitz, and others, but the claims against Siekevitz were voluntarily dismissed and the trial court ruled in plaintiff's favor on the cross-claims against him. The cross-complaint is not at issue on appeal.

Property).[5] Monopoly Game and Gladney were found jointly and severally liable for that amount, based upon the court's finding of alter ego status between them. The court did not hold Prael and Los Trancos liable for the $70,000 of the proceeds that they received from Monopoly Game.

The trial court also ruled in favor of plaintiff on the cause of action for conversion, finding that defendants had taken and disposed of plaintiff's personal property without his consent. The court awarded damages of $353,745, including $325,745 for plaintiff's scientific equipment and $28,000 for an antique oriental rug.

The trial court concluded the causes of action for rescission, quiet title, and injunctive relief were moot based upon plaintiff's settlement with Salma and plaintiff's reacquisition of the Property at a foreclosure sale in April 2008. The trial court found in favor of defendants on the causes of action for breach of contract, fraud, deceit, and civil conspiracy. With respect to the claim for damages under section 1695.7 of HESCA, the court found the Property was a " '[r]esidence in foreclosure' " within the meaning of section 1695.1, subdivision (b) and the Agreement failed "to comply with the Act in a variety of respects." However, notwithstanding the fact that Monopoly Game acquired title to the Property, the trial court found applicable an exception from the requirements of HESCA: under section 1695.1(a)(1), Monopoly Game was not an "equity purchaser" because Gladney intended to use the Property as a "personal residence."

Defendants appealed the trial court's judgment and plaintiff filed a cross-appeal.

## DISCUSSION

I. *The Trial Court Erred in Rejecting Plaintiff's HESCA Claim*

■ In enacting HESCA, "[t]he Legislature recognized that the equity value of a residence, often a homeowner's most significant financial asset, could be lost to a third party purchaser whenever a homeowner facing foreclosure succumbed to a proposal to sell his or her home for a fraction of its value." (*Segura, supra,* 5 Cal.App.4th at pp. 1034–1035.) The Act requires

---

[5] The sum of $306,880.48 is the amount specified in the judgment; at one point in the statement of decision, the trial court lists the amount as $306,488.40.

a written agreement between an equity purchaser and an equity seller and specifies that the contract "include the total consideration given, terms of payment and terms of any rental agreement; a conspicuous statement of the right to cancel within five business days or until 8 a.m. on the day scheduled for foreclosure, with an attached notice of cancellation; and a conspicuous notice that until the right to cancel has ended, the equity purchaser cannot ask the seller to sign a deed or any other document. (§§ 1695.3–1695.5.) The equity purchaser must provide, and complete, the contract in conformity with these terms. (§ 1695.6, subd. (a.)." (*Segura*, at p. 1035; see also *Spencer v. Marshall* (2008) 168 Cal.App.4th 783, 793–795 [85 Cal.Rptr.3d 752] (*Spencer*).)

Plaintiff's second cause of action seeks damages and an award of attorney fees under section 1695.7 based on allegations that defendants' purchase of the Property violated HESCA in various respects.[6] The trial court found the Property was a " '[r]esidence in foreclosure' " under section 1695.1, subdivision (b) and "on its face the . . . Agreement does not comply with the Act in a variety of respects." The court continued, "Thus, if the Act applied, the . . . Agreement would have violated th[e] Act, and [d]efendants would be liable for damages equal to any loss of the home equity which [p]laintiff possessed as of November 14, 2003." Those findings are undisputed on appeal.

For purposes of HESCA, an " '[e]quity purchaser' means any person who acquires title to any residence in foreclosure . . . ," subject to certain specified exceptions. (§ 1695.1(a).) The trial court concluded that the exception contained in section 1695.1(a)(1) applies because Monopoly Game acquired title for the purpose of Gladney using the Property as his personal residence. The court rejected plaintiff's contention that the fact that Monopoly Game acquired title, rather than Gladney, made the exception inapplicable, reasoning "[t]he evidence at trial established that Monopoly Game . . . and . . . Gladney were and are alter-egos of each other, such that . . . Gladney may benefit from the safe harbor established by section 1695(a)(1) despite the form of the . . . Agreement."

In determining whether defendants' conduct violated the Act, "we apply well-established rules of statutory construction. The goal of statutory construction is to ascertain and effectuate the intent of the Legislature.

---

[6] On appeal, plaintiff summarizes the violations relating to the Agreement as follows: it "did not include a notice of right to cancel, did not identify the address of Monopoly Game or Gladney, did not provide any notice of a right to cancellation, did not include a description of any services to be provided by . . . Prael and Los Trancos, and did not contain the mandatory notices required by . . . section[s] 1695.5 and 1695.6." Defendants do not contend the Agreement was in compliance with the Act.

[Citation.] Often, the words of the statute provide the most reliable indication of legislative intent. [Citation.] However, when the statutory language is itself ambiguous, we must examine the context in which the language appears, adopting the construction that best harmonizes the statute internally and with related statutes. [Citation.] ' "When the language is susceptible of more than one reasonable interpretation . . . we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." ' [Citation.]" (*Rothschild v. Tyco Internat. (US), Inc.* (2000) 83 Cal.App.4th 488, 496 [99 Cal.Rptr.2d 721].) When, as here, "a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed [citation]." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) We review the trial court's decision on statutory interpretation de novo. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956].)

■ The relevant statutory language exempts from the definition of an "equity purchaser" a person who acquires title to a residence in foreclosure "[f]or the purpose of using such property as a personal residence." (§ 1695.1(a)(1).) Plaintiff contends that, in order to fall within the scope of the exception, the person who acquires title must be the same person who intends to use the property as a residence; defendants contend that the person acquiring title and the person who will reside in the property need not be the same. The statutory language is ambiguous. The phrasing, "acquires . . . for the purpose of using," seems to suggest that the person who acquires title must also be the person who will use the property as a residence, because one who acquires title to a property and allows another to reside in it is arguably not "using such property as a personal residence." (§ 1695.1(a); see *Spencer, supra,* 168 Cal.App.4th at p. 797 [in dicta, describing exception as applying to property "purchased for one's own personal residence"].) On the other hand, in this case Monopoly Game arguably bought the Property "for the purpose of using" it as a residence for Gladney. In effect, defendants contend the Legislature meant to exempt both the circumstance in which a person acquires title for his or her residential use, as well as the circumstance in which a person acquires title for residential use by another.[7]

---

[7] Defendants contend the Legislature's use of "*a* personal residence" instead of "*his or her* personal residence" supports their construction. However, that does not resolve the ambiguity because the Legislature may have chosen "*a* personal residence" to allow for the possibility that the purchaser may have more than one residence. (Cf. § 1695.1, subd. (b) [" 'Residence in foreclosure' and 'residential real property in foreclosure' means residential real property consisting of one- to four-family dwelling units, one of which the owner occupies as *his or her principal place of residence* . . . ." (italics added)].)

Because the language of the statute is susceptible to more than one reasonable interpretation, we look to extrinsic aids, such as the legislative purpose and legislative history. In enacting HESCA, the Legislature set forth detailed findings and statements of intent.

Section 1695, subdivision (a) provides: "The Legislature finds and declares that homeowners whose residences are in foreclosure have been subjected to fraud, deception, and unfair dealing by home equity purchasers. The recent rapid escalation of home values, particularly in the urban areas, has resulted in a significant increase in home equities which are usually the greatest financial asset held by the homeowners of this state. During the time period between the commencement of foreclosure proceedings and the scheduled foreclosure sale date, homeowners in financial distress, especially the poor, elderly, and financially unsophisticated, are vulnerable to the importunities of equity purchasers who induce homeowners to sell their homes for a small fraction of their fair market values through the use of schemes which often involve oral and written misrepresentations, deceit, intimidation, and other unreasonable commercial practices."

Section 1695, subdivision (b) provides: "The Legislature declares that it is the express policy of the state to preserve and guard the precious asset of home equity, and the social as well as the economic value of homeownership."

Section 1695, subdivision (c) provides: "The Legislature further finds that equity purchasers have a significant impact upon the economy and well-being of this state and its local communities, and therefore the provisions of this chapter are necessary to promote the public welfare."

Finally, section 1695, subdivision (d) provides: "The intent and purposes of this chapter are the following: [¶] (1) To provide each homeowner with information necessary to make an informed and intelligent decision regarding the sale of his or her home to an equity purchaser; to require that the sales agreement be expressed in writing; to safeguard the public against deceit and financial hardship; to [e]nsure, foster, and encourage fair dealing in the sale and purchase of homes in foreclosure; to prohibit representations that tend to mislead; to prohibit or restrict unfair contract terms; to afford homeowners a reasonable and meaningful opportunity to rescind sales to equity purchasers; and to preserve and protect home equities for the homeowners of this state. [¶] (2) This chapter shall be liberally construed to effectuate this intent and to achieve these purposes."

■ The Act applies to any transaction under which a person acquires title to a residence in foreclosure, *unless* the transaction falls within the scope of one of the listed exceptions. (*Segura, supra,* 5 Cal.App.4th at p. 1037.) Although there is no legislative history on point,[8] the exceptions appear to reflect a legislative judgment that the specified transactions present lesser concerns regarding the "fraud, deception, and unfair dealing" (§ 1695, subd. (a)) that motivated enactment of the Act. Thus, the other transactions exempted from the Act involve circumstances where the homeowner is protected by statutory procedures or title is acquired by a court judgment (§ 1695.1(a)(3)–(5)), where the acquisition of title is "in lieu of foreclosure" (§ 1695.1(a)(2)), or where the homeowner is a close relative of the person acquiring title (§ 1695.1(a)(6)).

Plaintiff's interpretation of the exception is the more reasonable one. Defendants' broad interpretation would exempt from the requirements of the Act not only a transaction where a company acquires title for residential use by an alter ego, but also a transaction where a company acquires title for residential use by any other person, including residential use by a renter. The only type of transaction that would *not* be exempted is one where the person acquiring title did not intend to "use" the property at all, but only intended to resell it. Defendants' interpretation would present more opportunity for misuse of the exception, because it would permit persons in the business of home equity purchasing to structure transactions to come within the scope of the exception. This is particularly true because the exception does not mandate personal residential use for any particular period of time, so companies could acquire title to properties under the color of the section 1695.1(a)(1) exception, and then resell them after "using" them residentially for a relatively short period of time. Application of the exception in this case would be particularly ironic, because Monopoly Game, which is in the business of home equity purchasing, is the "archetypal" purchaser targeted by the Act. (*Segura, supra,* 5 Cal.App.4th at p. 1037.) The Legislature at the very least intended to regulate the transactions of such companies. (*Ibid.*)

■ Plaintiff's interpretation limits the exception to the circumstance that presents the least potential for fraud—where the person who acquires title and the person who will reside in the property are one and the same. In light of the legislative directive to construe the Act liberally to protect homeowners in foreclosure (§ 1695, subd. (d)(2)), it is appropriate to construe the exceptions narrowly. (*Spencer, supra,* 168 Cal.App.4th at p. 798 ["we narrowly construe the exceptions"].)[9] Construing the section 1695.1(a)(1) exception narrowly

---

[8] The parties have not directed us to, and we have not located, any legislative history addressing the exceptions in HESCA.

[9] In *Spencer, supra,* 168 Cal.App.4th at page 798, the court concluded that the section 1695.1(a)(4) exception did not encompass an equity purchase authorized by the bankruptcy

furthers the Legislature's intent "to safeguard the home equities of California homeowners; encourage fair dealing in the sale of distressed residences; restrict unfair contract terms; provide homeowners with the necessary information to make an intelligent decision about selling their home; and afford them meaningful opportunity to rescind. (§ 1695, subd. (d)(1).)" (*Segura, supra,* 5 Cal.App.4th at p. 1037.) The construction we adopt does not undermine the Legislature's intent to exempt purchasers who intend to reside in the properties acquired, because such persons can bring themselves within the scope of the exception by acquiring title in their own names.[10]

■ The trial court concluded that this transaction fit within section 1695.1(a)(1) because Gladney intended to reside in the property and Monopoly Game is the alter ego of Gladney. This was an improper application of the alter ego doctrine.[11] *Communist Party v. 522 Valencia, Inc.* (1995) 35

statutes where the purchase did not occur " '[*at*] any sale of property authorized by statute' [citation]." (*Spencer, supra,* 168 Cal.App.4th at p. 796.)

[10] At the time the state Senate was considering Senate Bill No. 1128 (1979–1980 Reg. Sess.) (hereafter Senate Bill No. 1128), which enacted HESCA, the state Assembly was considering Assembly Bill No. 827 (1979–1980 Reg. Sess.) (hereafter Assembly Bill No. 827). A Senate committee analysis described Assembly Bill No. 827 as a "[s]imilar bill" that "would enact similar provisions, licensing and regulating the activities of persons who deal in residential real property in foreclosure." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1128 (1979–1980 Reg. Sess.) as amended May, 16, 1979, p. 10.) An Assembly committee analysis stated the provisions of the bills are "not in conflict." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1128 (1979–1980 Reg. Sess.) as amended May 31, 1979, p. 7.) Assembly Bill No. 827 was enacted as Business and Professions Code former sections 11700, 11701 and 11702. (Added by Stats. 1979, ch. 655, § 2, p. 2016, eff. Sept. 14, 1979, repealed by Stats. 1980, ch. 423, § 2, p. 834, eff. July 11, 1980.) Business and Professions Code former section 11700, subdivision (b)(1) provided that the enactment did not apply to "[t]he acquisition of property *for use as the personal residence of the buyer.*" (Stats. 1979, ch. 655, § 2, p. 2016, italics added.) Although the wording of the exception in Business and Professions Code former section 11700, subdivision (b)(1) is clearer than that in Civil Code section 1695.1(a)(1), we do not believe we can rely on the distinction either to support our narrow interpretation, or as support for a broader construction of the section 1695.1(a)(1) exception. In particular, although the wording of Business and Professions Code former section 11700, subdivision (b)(1) shows one way the Civil Code section 1695.1(a)(1) exception could have been drafted to avoid any ambiguity, there are many wording differences in the statutes enacted by Senate Bill No. 1128 and Assembly Bill No. 827. Nothing in the legislative history of Senate Bill No. 1128, Assembly Bill No. 827, or Assembly Bill No. 2475 (1979–1980 Reg. Sess.) (hereafter Assembly Bill No. 2475), which repealed Business and Professions Code former sections 11700, 11701 and 11702 and amended Civil Code section 1695.1 (Stats. 1980, ch. 423, §§ 2, 4, pp. 834, 835, eff. July 11, 1980), indicates that the Legislature, in passing Senate Bill No. 1128 or Assembly Bill No. 2475, considered the differences and deliberately selected the wording in section 1695.1(a)(1) rather than that in Business and Professions Code former section 11700, subdivision (b)(1).

[11] "[A] limited liability company is a hybrid business entity formed under the Corporations Code consisting of at least two members who own membership interests. The company has a legal existence separate from its members. While members actively participate in the management and control of the company, they have limited liability for the company's debts and

Cal.App.4th 980 [41 Cal.Rptr.2d 618] (*Communist Party*) explained that doctrine as follows: "Ordinarily, a corporation is regarded as a legal entity separate and distinct from its stockholders, officers and directors. Under the alter ego doctrine, however, where a corporation is used by an individual or individuals, or by another corporation, to perpetrate fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, a court may disregard the corporate entity and treat the corporation's acts as if they were done by the persons actually controlling the corporation. [Citations.]" (*Id.* at p. 993.) In the present case, however, the trial court used the alter ego doctrine to *shield* defendants from liability under HESCA. "[A]lter ego is used to prevent a corporation from using its statutory separate corporate form as a shield from liability only where to recognize its corporate status would defeat the rights and equities of third parties; it is not a doctrine that allows the persons who actually control the corporation to disregard the corporate form." (*Communist Party,* at p. 994; see also *Brooklyn Navy Yard Cogeneration Partners v. Superior Court* (1997) 60 Cal.App.4th 248, 257–258 [70 Cal.Rptr.2d 419] (*Brooklyn Navy Yard*) [to justify application of the alter ego doctrine, it must be shown that " 'inequitable results will follow if the corporate separateness is respected' "]; *Opp v. St. Paul Fire & Marine Ins. Co.* (2007) 154 Cal.App.4th 71, 76 [64 Cal.Rptr.3d 260] ["An individual who has obtained the benefits of corporate limited liability will not be permitted to repudiate corporate existence just because the corporation has become an inconvenience."]; *Aladdin Oil Corp. v. Perluss* (1964) 230 Cal.App.2d 603, 614 [41 Cal.Rptr. 239] ["The *alter ego* doctrine is applied to avoid inequitable results not to eliminate the consequences of corporate operations. [Citations.]"].)[12]

 The trial court did not identify in its statement of decision, and defendants have not identified on appeal, any inequitable results that would follow from rejecting defendants' attempt to disregard the legal separateness of Monopoly Game. (See *Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 301 [216 Cal.Rptr. 443, 702 P.2d 601] ["the corporate form will be disregarded only in narrowly defined circumstances and only when the ends of justice so require"]; *Brooklyn Navy Yard, supra,* 60 Cal.App.4th at p. 259 ["some cases have allowed corporations to disavow the corporate form where doing so prevents injustice"].) Neither have defendants cited any cases

---

obligations to the same extent enjoyed by corporate shareholders. [Citations.]" (*Kwok v. Transnation Title Ins. Co.* (2009) 170 Cal.App.4th 1562, 1571 [89 Cal.Rptr.3d 141] (*Kwok*).) Under Corporations Code section 17300, a member of a limited liability company "has no interest in specific limited liability company property." (Accord, *Kwok,* at pp. 1570–1571.)

[12] Defendants do not contend the fact that Monopoly Game is a limited liability company rather than a corporation affects application of the alter ego doctrine in this case. (See Corp. Code, § 17101, subd. (b) ["A member of a limited liability company shall be subject to liability under the common law governing alter ego liability . . . ."]; see also *People v. Pacific Landmark, LLC* (2005) 129 Cal.App.4th 1203, 1212 [29 Cal.Rptr.3d 193].)

supporting their attempt to employ the alter ego doctrine to establish a relationship of identity between two defendants, in order to impute the intent or actions of one to the other and to allow both to avoid liability under a statutory safe harbor. The trial court erred in concluding that the alter ego doctrine rendered the section 1695.1(a)(1) exception applicable in the present case.

Based on other causes of action, the trial court ordered defendants Monopoly Game and Gladney to pay plaintiff $306,880.48, "restoring [plaintiff's] equity in the Property which Monopoly Game . . . obtained on or near December 18, 2003," the date of the sale of Property to Salma. Plaintiff does not contend he is entitled to greater damages for the HESCA violation, under which the lost equity would be valued at the date of transfer to Monopoly Game on November 14, 2003. (*Segura, supra*, 5 Cal.App.4th at pp. 1038–1039.) Thus, our conclusion that the court erred in denying plaintiff's HESCA claim does not require recalculation of the damages for loss of plaintiff's home equity.

We are, however, required to remand to the trial court for an award of attorney fees to plaintiff. Section 1695.7 states that "An equity seller may bring an action for the recovery of damages or other equitable relief against an equity purchaser for a violation of any subdivision of Section 1695.6 or 1695.13. The equity seller shall recover actual damages plus reasonable attorneys' fees and costs." (See also *Boquilon v. Beckwith* (1996) 49 Cal.App.4th 1697, 1721–1722 [57 Cal.Rptr.2d 503].)[13]

II.–IV.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

This matter is remanded with directions for the trial court to award attorney fees to plaintiff under HESCA and to enter an amended judgment including the award of attorney fees and specifying that Los Trancos is

---

[13] Among other things, section 1695.6 requires the equity purchaser to provide a contract in compliance with sections 1695.2, 1695.3, and 1695.5. As noted previously, defendants do not contend the Agreement was in compliance with the Act.

[*]See footnote, *ante*, page 344.

jointly and severally liable for $70,000 of the $306,880.48 awarded to plaintiff as restoration of his lost equity in the Property. In all other respects, the judgment is affirmed. Costs on appeal are awarded to plaintiff.

Jones, P. J., and Needham, J., concurred.