Filed 9/29/15  Medina v. Sarkisian CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| RUDY MEDINA,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>JOHN SARKISIAN,<br><br>    Defendant and Appellant. | D064490<br><br><br>(Super. Ct. No.<br>  37-2007-00069058-CU-DF-CTL) |

APPEALS from a judgment and postjudgment orders of the Superior Court of San Diego County, Kevin A. Enright, Judge.  Affirmed in part, reversed in part and remanded with directions.

Boudreau Williams and Jon R. Williams; Robert G. Dryer, Robert Wallach for Defendant and Appellant John Sarkisian.

Chapin Fitzgerald and Edward D. Chapin, Kenneth M. Fitzgerald; Fitzgerald Knaier and Kenneth M. Fitzgerald, Robert G. Knaier, for Plaintiff and Appellant Rudy Medina.

Plaintiff Rudy Medina and defendant John Sarkisian were partners in a limited liability company, Del Mar Heritage, LLC (Heritage). After disputes arose between them, Sarkisian sued Medina, Medina cross-complained, and in a jury trial on Medina's cross-complaint, the jury found in Heritage's favor on Medina's claims against it for fraud (intentional and negligent disclosure as well as fraud by concealment), but deadlocked on whether Sarkisian was liable for fraud and breach of fiduciary duty. In a second jury trial on Medina's claims for fraud against Sarkisian, the jury returned verdicts against Sarkisian on Medina's claims for fraud, breach of fiduciary duty, breach of contract, and breach of the covenant of good faith and fair dealing.

Sarkisian appeals from the judgment following those verdicts and from a postjudgment order denying his motion for judgment notwithstanding the verdict (JNOV). Medina appeals from an order denying his motion for prejudgment interest. Sarkisian contends: (1) as a matter of law based on the first jury's findings absolving Heritage of liability, he is not personally liable on Medina's claims in the second action, entitling him to JNOV on those claims; (2) there is in any event insufficient evidence Medina reasonably relied on any of Sarkisian's alleged misrepresentations to support the jury's verdicts for fraud or breach of fiduciary duty; and (3) because the trial court granted JNOV in his favor on Medina's contract claim the judgment must be modified to enter judgment in his favor on that claim, and Medina necessarily cannot recover on his claim for breach of the implied covenant of good faith and fair dealing. Medina contends the trial court erred in denying his motion for prejudgment interest.

2

Only Sarkisian's latter claim has merit. Having granted JNOV on Medina's contract claim, the court should have also granted JNOV on Medina's claim for breach of the implied covenant of good faith and fair dealing. We reject Sarkisian's other contentions, and conclude Medina has not demonstrated the trial court erred in denying him an award of prejudgment interest. The judgment with respect to Medina's claims for breach of contract and breach of the implied covenant of good faith and fair dealing is reversed and the matter remanded for the trial court to modify the judgment to enter JNOV in Sarkisian's favor on those claims. In all other respects the judgment and orders are affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Sarkisian and Medina formed Heritage, a real estate company that is a member-

---

[1] Our summary and understanding of the factual background was made difficult by both Sarkisian's and Medina's citation to trial exhibit numbers (e.g., "Exh. 680" or "Exhs. 652, 411, 130") without referencing the specific page number of the respondent's appendix. Briefs must "support any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." (Cal. Rules of Court, rule 8.204, subd. (a)(1)(C).) Medina represents that the referenced trial exhibits are all included in the respondent's appendix at tab Nos. 7 through 40, but some of the exhibits (trial exhibit Nos. 130, 370, 384, 388, 411, 471, 524, 652, 735, for example) do not appear there. Medina also makes many assertions, frequently argumentative, without any record citation (i.e., "The Poinsettia Ridge project had been held by [Heritage] for ten years. The day after Medina was gone, Sarkisian was actively preparing to market it, and five weeks later, he engaged a broker to do so" or "Less than 24 hours after Mr. Medina sold his interest in the Pala project though the Final Separation Agreement, Mr. Sarkisian finalized a binding agreement with the Pala Band to sell that project at a sales price that would have yielded Medina over $760,000 more than the price paid by Ayyad.").

managed LLC,[2] in the mid-1990's. They eventually became 50/50 partners in Heritage. After 2001, Sarkisian formed another company and Medina ran Heritage full time, though they remained 50 percent partners and interacted daily together. Heritage was highly successful, and each partner received between $4 and $5 million up until the end of 2005.

In 2004, Medina's father was diagnosed with ALS ("Lou Gehrig's Disease"). Medina, his mother and siblings cared for him until he died a few months later. While caring for his father, Medina, who had a previous chronic back condition, suffered a spinal injury. His father's death had a significant impact on Medina. He was not sleeping, suffered a high degree of pain, and was less effective at work. He began taking narcotics and other pain medications. Medina's condition also caused him to take medications for depression and anxiety. He finally took a leave of absence from Heritage in 2006.

Eventually, Sarkisian confronted Medina about his drug use. In March 2006, Medina set up a meeting with Sarkisian and Medina's doctor so Sarkisian could inquire about Medina's condition. Sarkisian asked the doctor if Medina was addicted to medications; the doctor responded that Medina was being treated for extreme pain, and was moving toward surgery. Toward the end of the meeting Sarkisian told Medina that

---

2    The California Revised Uniform Limited Liability Company Act (Corp. Code, § 17701.01 et seq., added by Stats. 2012, ch. 419, § 20) took effect January 1, 2014, supplementing the Beverly-Killea Limited Liability Company Act (former Corp. Code, § 17000 et seq., repealed by Stats. 2012, ch. 419, § 19). Because the parties' disputes arose and trial took place before 2014, the Beverly-Killea Limited Liability Company Act applies.

Medina's wife was a burden to Medina and his effectiveness or ability to perform. Despite that comment, Sarkisian assured Medina that he would take care of Heritage; that they were "fine" and would still be 50 percent partners.

In May 2006, however, Sarkisian told Medina he wanted a "divorce" from their partnership. Medina was shocked and disappointed; he felt ambushed. Sarkisian told Medina he would take the lead in the separation process and that they would use joint legal counsel. Medina, who was fine with that arrangement, thereafter scheduled his back surgery, which he underwent in September 2006. Medina did not feel the need for independent legal counsel because Medina trusted Sarkisian, whom he described as his best friend and partner, someone he would trust with the lives of his child and family, and the smartest guy he had ever met. Medina believed Sarkisian was on his side.

Unbeknownst to Medina, in or around early June 2006, Sarkisian was having discussions with Willy Ayyad, an investor in other Heritage projects who was also Sarkisian's friend and onetime neighbor, about a project in Costa Rica in which Sarkisian sought to invest via Heritage. Sarkisian had made a "commitment" to Ayyad and a development group and viewed it as a "first deal as an opportunity to get a working relationship moving with [the development company] and my company . . . Heritage." In an e-mail, Sarkisian explained he had committed an investment of $1 to $2 million "dependant [*sic*] on the financial arrangements I make with my partner as I buy him out of [Heritage]."

Medina and Sarkisian entered into an interim separation agreement effective June 16, 2006, under which Medina was to receive a $30,000 monthly draw during the interim

5

period. By then, Medina was on leave from Heritage and no longer running the company. During the interim period and as part of their final separation agreement, Medina agreed to sell his interests in two Heritage projects—raw land located on the turnoff to the Pala Casino (the Fallbrook land) and an apartment complex called Poinsettia Ridge—to Ayyad. Sarkisian dealt with Ayyad on Medina's behalf in those dealings; Medina never communicated directly with Ayyad. Medina knew Sarkisian and Ayyad were friends, but nothing more. He did not learn about Sarkisian and Ayyad's venture in Costa Rica before selling his interests in the Fallbrook land and Poinsettia Ridge.

As of December 2006, Sarkisian stopped making the monthly $30,000 payments to Medina, telling him Heritage was out of cash. Sarkisian knew Medina needed money at the time.

On February 8, 2007, Sarkisian and Medina, represented by the same counsel, entered into a final separation agreement. As of that day, Medina understood the Fallbrook land was going to be held and permitted for a long-term investment return of $33 million, which would take three to five years. He understood that Poinsettia Ridge was a "forever hold" for the partnership's participants. Medina signed the final separation agreement despite the fact he was still convalescing and trying to wean off medication, which caused him to suffer from depression and severe anxiety. Medina did so because he had made the commitment, and he needed financial security.

In June 2007, Sarkisian sued Medina for libel, slander and other causes of action, alleging in part that Medina had made false and intentionally defamatory statements

6

about Sarkisian's financial integrity and personal character. Medina then cross-complained, alleging numerous causes of action including for rescission of the separation agreement, fraud and breach of fiduciary duty. In part, he alleged that Sarkisian stopped making interim monthly payments, and also misrepresented or concealed material facts concerning the Fallbrook land and Poinsettia Ridge to induce or force him to agree to the terms of the final separation agreement.

A jury trial commenced on the parties' operative complaint and cross-complaint, after which the jury returned a special verdict on Medina's cross-complaint reflecting separate verdict questions as to Sarkisian and Heritage. As to Heritage, the jury found it did not intentionally or negligently make a false representation of an important fact to Medina and did not intentionally fail to disclose an important fact to Medina. As to Sarkisian, the jury deadlocked, leaving most of the verdict questions blank.

The matter was eventually set for retrial on Medina's claims against Sarkisian and Sarkisian's claim for breach of contract against Medina. Before trial, Sarkisian moved in limine to apply collateral estoppel to the claims against him based on the jury's findings that Heritage did not commit fraud. Sarkisian's counsel argued that all of the evidence in the first case showed that Sarkisian was acting through and on behalf of Heritage, absolving him of liability on Medina's claims. Medina's counsel responded in part by pointing out that Sarkisian in the first trial wanted separate verdict forms and questions separately directed to Heritage and Sarkisian, and there was never any concession that they were the same or alter egos. Characterizing the motion as a judgment on the

7

pleadings, the trial court provisionally denied the motion, reasoning that the question of alter ego was not tried in the first case.

Following trial on the matter, the jury returned a verdict finding Sarkisian liable for intentional and negligent misrepresentation as well as fraud by concealment and breach of fiduciary duty. It also found Sarkisian had breached a contract with Medina, as well as the covenant of good faith and fair dealing. The jury awarded Medina $1,591,586 in damages on both his fraud and contract claims,[3] and awarded Sarkisian $200,000 on Sarkisian's breach of contract claim against Medina.

Thereafter, the parties briefed Medina's entitlement to prejudgment interest. Sarkisian also moved for JNOV. Citing no legal authority for the proposition, Sarkisian argued that because Heritage could only have acted through him, the jury's finding absolving Heritage of fraud liability also constituted a finding that he could not be individually liable for fraud. Sarkisian also argued that there was no substantial evidence to support the jury's fraud and breach of fiduciary duty verdicts against him. Finally, Sarkisian argued he was entitled to JNOV on both Medina's and his own breach of contract claims. Medina opposed the motion. As to his breach of contract cause of action, Medina stated JNOV was unnecessary because he "ha[d] already waived his right to recover on that cause of action."

---

3    On Medina's claim for breach of the covenant of good faith and fair dealing, the jury was told to disregard the question as to damages, and it inserted "not applicable" in that space.

The trial court denied Sarkisian's motion for JNOV except as to Medina's claim for breach of contract. It found the jury's verdicts were supported by substantial evidence, but as to Medina's claim for breach of contract, JNOV was appropriate, and it ordered the judgment be modified to enter judgment in Sarkisian's favor on that claim. The court denied Medina's request for an award of prejudgment interest on grounds his damages were not certain or capable of being made certain as required by Civil Code section 3287, subdivision (b).

Sarkisian appeals from the judgment and order denying his motion for JNOV. Medina appeals from the order denying prejudgment interest.

DISCUSSION

I. *Effect of First Jury's Findings as to Heritage*

Pointing out that Medina's allegations in his operative cross-complaint against Heritage and Sarkisian were identical and that Medina pleaded that Sarkisian was Heritage's alter ego, Sarkisian contends that when the jury in the first trial found Heritage did not defraud Medina, it necessarily found he had not committed those acts. Sarkisian asserts that in the first trial, there was no evidence he acted in any other capacity or outside the scope of his agency with Heritage, demonstrating that it was only through him that Heritage could have made representations or disclosures. Sarkisian further argues that even if he was separate from Heritage, the law is settled that a principal can only be liable if his agent is liable. From this proposition, Sarkisian argues: "The inverse corollary to that long-established rule is also true: where liability is derivative only, and a finder of fact thereby is asked to evaluate the actions of an agent acting with [*sic*] the

9

course and scope and on that basis, finds that the principal is not liable, the agent cannot be separately found liable for that same conduct." Sarkisian does not cite legal authority for this latter assertion.

Medina responds that the factual predicate for these arguments is wrong: that (1) the jury never decided the issue of alter ego—whether Heritage and Sarkisian should be treated as one and the same—in the first trial, but Sarkisian maintained that he was entirely separate from Heritage and requested separate liability verdict questions; (2) the issue of alter ego was never litigated and decided for purposes of applying the doctrine of collateral estoppel; and (3) there was evidence at the first trial demonstrating that individuals other than Sarkisian acted on Heritage's behalf.[4] Medina further argues the law does not support Sarkisian's argument. Specifically he points out that under the respondeat superior doctrine a company is vicariously liable for an employee's acts, but it is not liable for malicious acts or acts that substantially deviate from the employee's duties. Citing *Holt v. Booth* (1991) 1 Cal.App.4th 1074, Medina argues it is well established that an agent is always liable for his own torts whether or not his employer is liable. Finally, Medina argues Sarkisian waived the issue by failing to raise it in a timely and proper manner after the *first trial*; that Sarkisian's pretrial evidentiary motion before

---

[4]     As to the latter argument, Medina purports to cite Sarkisian's trial testimony recounting other Heritage staff who worked with Medina. But the cited testimony does not appear in the referenced portion of the record, which was a declaration of counsel with attached exhibits. Medina's brief at this point unhelpfully cites only to the tab number of his respondent's appendix and the page and line numbers of the documents contained within the tab (e.g., "1 RA 6, Declaration of Kenneth Fitzgerald . . . ¶ 2, Ex. A . . . at 17:3-18:2" or "Fitzgerald Dec. ¶ 3, Ex. B . . . at 29:7-27") without citing to the bates-stamped pages of the appendix itself.

the second trial was procedurally improper and amounted to an untimely motion for JNOV with respect to the first trial, as the jury did not reach any verdicts as to Heritage in the second trial.

Medina's waiver argument has merit, but not for the reasons advanced. Sarkisian's in limine motion was akin to a dispositive motion for summary judgment or nonsuit. Though motions in limine are not designed to replace dispositive motions (see *Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1593-1594), trial courts have the inherent power to use them in this way. (*Id.* at p. 1595.) Medina cites no authority for his claim that the in limine motion was procedurally improper, and we cannot so conclude. However, on this record, we can conclude Sarkisian forfeited this argument.

Under these circumstances, where Sarkisian is claiming the jury's verdict as to Heritage required it to reach the same verdict as to him, he was required to object to the verdict before the jury's discharge *following the first trial* on grounds the verdict was defective or incomplete by virtue of the blank verdict questions as to him, when those issues could have been fleshed out or corrected. (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 263-270 [an objection to a defective verdict must be made before the jury is discharged and defects apparent when the verdict was read and that could have been corrected are forfeited by counsel's failure to timely object]; compare *Morris v. McCauley's Quality Transmission Service* (1976) 60 Cal.App.3d 964, 970 [failure to object to internally inconsistent verdict was not a forfeiture where verdict necessarily implied the defendant was not negligent as to a minor, and another verdict in the same

11

case implied defendant was negligent as to minor's mother, whose claim was derivative of the minor's].)

Sarkisian's arguments fail on this record for additional reasons. As a threshold matter, Sarkisian's focus on Medina's pleadings is unavailing. Whether Medina set forth alter ego allegations is irrelevant if he did not *also* present evidence sufficient to prove them at trial. (See *Judelson v. American Metal Bearing Co.* (1948) 89 Cal.App.2d 256, 263 [elements of alter ego "must be shown by the evidence" and "[a]ffirmative proof or direct inference from proof must be present to establish that there is such unity of interest and ownership as indicates a cessation of the individuality and separateness of the person and corporation"]; *Vasey v. California Dance Co.* (1977) 70 Cal.App.3d 742, 749 [plaintiff must "plead *and prove* such a unity of interest and ownership" to support a claim based on disregard of the corporate form], italics added.) Indeed, Medina's conclusory alter ego allegations would not have sufficed even if Sarkisian had defaulted. (*Vasey*, at p. 749.)

The matter presents a question of how to interpret the jury's special verdicts in the first trial; the jury's decision, and the matters it actually decided must be viewed in light of the verdict questions and answers, the evidence, and the court's instructions to the jury. (See *Fransen v. Washington* (1964) 229 Cal.App.2d 570, 574; *Fernandez v. Consolidated Fisheries, Inc.* (1953) 117 Cal.App.2d 254, 263 [trial judge's function is to "interpret the verdict from its language considered in connection with the pleadings, evidence and instructions"].) Moreover, "all reasonable inferences will be indulged in on appeal to support, rather than defeat, a jury's verdict and the judgment rendered thereon." (*Fransen*

12

*v. Washington*, at p. 574.)  We are not bound by the trial court's interpretation.  (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325.)  Thus, notwithstanding the normal standard of review on the trial court's denial of a JNOV (see *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68 [applying substantial evidence review standard]), we are required to analyze the special verdict form de novo.  (*Saxena*, at p. 325; *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1242.)

Here, the first jury was asked to make separate and independent findings for Heritage and Sarkisian as to fraud, and though it reached defense verdicts as to Heritage, it left blank those regarding Sarkisian.  Neither party presents a record concerning the parties' or trial court's reasons for presenting the jury with separate verdicts, so we begin by inferring in favor of the verdict that there was some theory to impose separate liability against Heritage, on the one hand, and Sarkisian, on the other.

Given this inference and for other reasons explained below, we are unable to interpret the first jury's verdict absolving Heritage as also absolving Sarkisian.  Though it is Sarkisian's burden to demonstrate error, he has not presented any evidence from the first trial supporting his assertions that "it was only through Sarkisian that any of the disputed representations [or] disclosures . . . to Medina were made" or that "the only way [Heritage] could be found liable for fraud is if Sarkisian committed fraud."  (Italics omitted.)  As we have explained, pointing to Medina's conclusory pleadings does not suffice.  And, exhibits and testimony from the second trial reveal that Heritage had other employees on its payroll, including Nick Foussianes and Misty Madrid, who dealt with Sarkisian and Medina during the time of interim separation.  Nor has Sarkisian presented

13

any jury instructions from the first trial. Thus, we cannot know whether the jury was instructed as to the alter ego doctrine,[5] or advised that the acts of Sarkisian were the acts of Heritage. There is no indication either party proved in the first trial that Heritage was undercapitalized, that Sarkisian asserted dominion and control over Heritage, or other indications of any unity of interest between Sarkisian and Heritage. Nor can we know, absent some of the record evidence presented in the first trial, whether the jury determined that Sarkisian acted in the course and scope of his agency, a factual question. (*Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 299 [whether an employee has acted within the scope of employment presents a question of fact, and becomes a question of law " 'when "the facts are undisputed and no conflicting inferences are possible" ' "].) Sarkisian provides no basis to conclude the jury in the first trial determined Heritage and Sarkisian were legally indistinguishable, or that it felt it did not need to reach a verdict as to Sarkisian *because of* its verdict as to Heritage.

---

5 Generally, a member or manager of an LLC cannot be held liable for the "debts, obligations, or other liabilities" of the LLC, "whether arising in contract, tort, or otherwise," solely by reason of his status as a member or manager. (Corp. Code, § 17703.04, subd. (a), former Corp. Code, § 17101, subd. (a); see *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538.) However, a member of a limited liability company can be subject to liability under the common law governing alter ego liability. (Former Corp. Code, § 17101, subd. (b); *Capon v. Monopoly Game LLC* (2011) 193 Cal.App.4th 344, 357, fn. 12; *People v. Pacific Landmark, LLC* (2005) 129 Cal.App.4th 1203, 1212.) "The alter ego doctrine prevents individuals or other corporations from misusing the corporate laws by the device of a sham corporate entity formed for the purpose of committing fraud or other misdeeds." (*Sonora Diamond*, at p. 538.) To invoke the alter ego doctrine, a plaintiff must plead and prove (1) that there is such a unity of interest and ownership that the separate personalities of the corporation and manager no longer exist; and (2) that if the acts are treated as those of only the corporation's, an inequitable result will follow. (See *ibid*.)

We observe that Sarkisian does not argue principles of collateral estoppel apply, as he had below. It would be his burden to establish its requirements in any event (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341[6]), and by failing to raise the issue here, we need not consider whether its elements were met.

## II. *Sufficiency of Evidence of Reasonable Reliance*

Sarkisian alternatively contends there is no evidence to support the jury's finding that Medina reasonably or justifiably relied on any of his representations concerning the Fallbrook land and Poinsettia Ridge transactions to support Medina's claims for fraud and breach of fiduciary duty.[7] With respect to the Fallbrook land, Sarkisian argues that even accepting Medina's version of the "sharply conflicted" evidence of what Medina was told about that transaction, that evidence establishes Medina could not have reasonably relied to his detriment on Sarkisian's statement that the deal was "dead" because he afterwards received other communications revealing that it was alive and moving forward. As to

---

[6] "Collateral estoppel precludes relitigation of issues argued and decided in prior proceedings. [Citation.] Traditionally, we have applied the doctrine only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding." (*Lucido v. Superior Court*, *supra*, 51 Cal.3d at p. 341.)

[7] Reliance is not an element of breach of fiduciary duty. "The elements of a cause of action for breach of fiduciary duty are: (1) the existence of a fiduciary duty; (2) the breach of that duty; and (3) damage proximately caused by that breach." (*Mosher v. Southern Cal. Physicians Ins. Exchange* (1998) 63 Cal.App.4th 1022, 1044.) Viewing Sarkisian's challenge as to the causation element, we reject it for the reasons stated below.

Poinsettia Ridge, Sarkisian contends Medina failed to present evidence of any secret plan to sell that property at the time Medina sold his interest to Ayyad.

A.  *Standard of Review and Legal Principles Pertaining to Justifiable Reliance*

" 'In reviewing the sufficiency of evidence on appeal, we resolve all conflicts in favor of the prevailing party and we indulge all legitimate and reasonable inferences to uphold the verdict if possible.  "It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury . . . ."  [Citation.]'  [Citation.]  ' "[W]e have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom." ' "  (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 527.)  Stated another way, " 'all of the evidence must be examined, but it is not weighed.  All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity[ ] to be accepted by the trier of fact.  If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed.' "  (*OCM Principal Opportunities Fund v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 866 (*OCM*), quoting *Estate of Teel* (1944) 25 Cal.2d 520, 527.)  We will not, of course, reverse a judgment for insufficient evidence merely because the witnesses offered conflicting testimony, " ' "for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a

16

determination depends." ' "  (*OCM*, at p. 867.)  Nevertheless, "[s]ubstantial evidence is not ' "synonymous with 'any' evidence.  It must be reasonable . . . , credible, and of solid value . . . ." ' "  (*OCM*, at p. 845.)

"A plaintiff asserting fraud by misrepresentation is obliged to plead and prove actual reliance, that is, to ' "establish a complete causal relationship" between the alleged misrepresentations and the harm claimed to have resulted therefrom.' [Citation.]  Actual reliance is also an element of fraud claims based on omission.  [Citation.]  [¶]  . . . ' "It is not . . . necessary that [a plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct . . . .  It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision." '  [Citations.]  Regarding concealment claims, the plaintiff may establish this element by showing that 'had the omitted information been disclosed, [he or she] would have been aware of it and behaved differently.' "  (*OCM*, *supra*, 157 Cal.App.4th at p. 864.)

" 'Besides actual reliance, [a] plaintiff must also show "justifiable" reliance, i.e., circumstances were such to make it *reasonable* for [the] plaintiff to accept [the] defendant's statements without an independent inquiry or investigation.' [Citation.]  The reasonableness of the plaintiff's reliance is judged by reference to the plaintiff's knowledge and experience.  [Citation.]  ' "Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact." ' "  (*OCM*, *supra*, 157 Cal.App.4th at pp. 864-865.)

17

When a fraud claim is based upon a misrepresentation or nondisclosure by a fiduciary, "the reliance element is relaxed . . . to the extent we may presume reasonable reliance . . . absent direct evidence of a lack of reliance." (*Estate of Gump* (1991) 1 Cal.App.4th 582, 601; *Edmunds v. Valley Circle Estates* (1993) 16 Cal.App.4th 1290, 1302 ["a representation in the context of a trust or fiduciary relationship creates a rebuttable presumption of reasonable reliance subject to being overcome by substantial evidence to the contrary"].) "This rebuttable presumption implements the long recognized public policy of imposing fiduciary duties upon partners in their relationship to one another." (*Edmunds*, at p. 708.)

With these principles and the applicable standard of review in mind, we set out the evidence of both the Fallbrook land and Poinsettia Ridge transactions in the light most favorable to Medina, and analyze whether there is substantial evidence meeting the above-referenced reliance standards.

B. *Trial Evidence as to the Fallbrook Land*

In 2006, investor Greg Smith, Medina and Sarkisian formed an LLC to acquire the Fallbrook land, with Smith holding a 50 percent interest and Medina and Sarkisian each holding a 25 percent interest. In the fall of 2006, they succeeded in eliciting the interest of the Pala Band of Mission Indians (Pala) for a possible sale. Smith exchanged information and documentation with Pala concerning the property, and met with its representatives.

By the fall of 2006, Pala had provided a letter of intent for a $12 million purchase of the Fallbrook land, which Sarkisian forwarded to Medina. Smith and Sarkisian argued

18

about the possible transaction almost every day. Sarkisian took the position that Pala had to put in a nonrefundable deposit as a condition to do a deal, which Smith believed was "nonsense" given the nature of the property and the type of efforts necessary to research possible development. In December 2006, Sarkisian offered to have Ayyad purchase Smith's interest for a considerable discount, but Smith refused to take a one million dollar "haircut." At about the same time, Sarkisian sent Medina a draft purchase and sale agreement. Medina was hopeful the purchase would go through, but as of the end of December, they had not heard anything and Medina was losing hope that a sale would occur. According to Smith, Sarkisian continued to take the position that the transaction could not close until Pala put money up and until then, there was no deal. Smith eventually gave up trying to convince Sarkisian to change his position since it was clear he was not going to change his mind, and Smith could not unilaterally force the sale. Smith felt Pala did not need to put the money up. He felt the transaction could have closed in late 2006 or during the first few weeks of 2007 had Sarkisian not taken his position.

Medina and Sarkisian met on January 16, 2007, concerning the Fallbrook land and Medina's sale of his interest in it to Ayyad. At the meeting, Sarkisian told Medina that the deal with Pala was "dead." He presented Medina with an investment book on permitting the land, indicating that Sarkisian and Ayyad had decided to move forward with that plan, which would result in a bigger payday of about $33 million in three to five years. Medina could not wait that long, and asked Sarkisian about the odds of a deal with the tribe. Sarkisian responded, "Rudy, it's not going to make," which Medina understood

19

to mean they were not going to do the deal. When Medina asked Sarkisian what he should do, Sarkisian told him to take the money from Ayyad; that that was the best option for him and his family. Medina trusted Sarkisian, and based on the documents Sarkisian showed Medina, he was "a hundred percent sure" Sarkisian and Ayyad were going to develop the Fallbrook land, not sell it to Pala. By the end of the January 16, 2007 meeting, Medina had decided to sell his interest in the Fallbrook land for $900,000 based on Sarkisian's advice and representations, as well as the documents shown to him. Medina was not aware that the night before, Sarkisian had finalized a deal with Ayyad for the Fallbrook land (giving Ayyad a 39 percent return on his investment in 45 days in a purchase by Pala) and for another project in which Medina had an interest.

The trial evidence showed that around the time of Medina and Sarkisian's meeting and afterwards, Sarkisian sent and received several e-mails concerning the project, only some of which were copied to Medina. On January 30, 2007, Medina was copied on e-mails in which a Pala representative advised Sarkisian that "Pala's offer would be under the same terms and conditions as previously offered in the red line version our attorney reviewed" and "[i]f you and Greg [Smith] agree to that, the only items that would require changing are the dates. [¶] We hope we can move forward with this transaction." Sarkisian responded by proposing to Smith (copying Medina), that the due diligence dates could be closed as long as the close of escrow remained March 6.

At about 4:30 p.m. on February 5, 2007, Sarkisian received a clean purchase and sale agreement for the Fallbrook land signed that day by Pala representatives. Despite having an agreement executed by Pala, an hour later, Sarkisian copied Medina on an e-

20

mail attaching an unsigned, heavily "red-lined" version of the purchase and sale agreement.[8]  Based on the nature of the attachment, Medina merely glanced at it and based on what Sarkisian had told him, he concluded they had a long way to go and were not going to reach an agreement.  On February 6, 2007, Medina was copied on an e-mail from Sarkisian in which Sarkisian stated in part that Pala had agreed to their terms of due diligence and close of escrow on April 2, 2007.  Medina did not recall reading that e-mail, which did not refer to price or attach a signed purchase and sale agreement.

Medina testified he did not focus on any e-mail concerning the Fallbrook land after the January 16, 2007 meeting and before he signed the final separation agreement on February 8, 2007, explaining:  "I was told, number one, it's a million to one shot; number two, it's not going to make; number three, we have a development program that's going to go out five years.  I didn't care about what they were going to do five years later, because it had nothing to do with me.  I would have been gone.  And so in my mind, my interest was sold."

Sarkisian never called Medina to alert him about the final sale agreement or tell him to disregard the red-lined version, and Medina testified that had he seen that

---

8      Sarkisian's e-mail, addressed to attorney Mike Hulme states:  "Mike  [¶]  Please review [the tribe's] changes to the PSA.  We, the sellers, are prepared to sign up to the economics and time frames proposed in the deal.  I have gone back to them to try and change the due diligence removal date to [M]arch 15th with a [close of escrow] of April 2nd.  They will let me know tomorrow."

agreement on February 5, 2007, he never would have sold his interest in Pala.[9] Medina eventually learned that a sale had occurred when he received another $200,000 from Sarkisian, who had promised him if they closed a deal with the tribe he would pay Medina that amount. Medina did not ask Sarkisian about it, stating, "I just felt that based on what [Sarkisian] told me, they got lucky, I got lucky to get the [$200,000], and they ended up selling after all, even though they didn't think they were going to. And so there was nothing to talk about." Medina never saw the final purchase and sale agreement until after litigation commenced.

## C. *Trial Evidence as to Poinsettia Ridge*

Sarkisian and Medina equally shared a 35 percent ownership interest in Poinsettia Ridge via another entity. The other 65 percent was owned by a friend of Sarkisian's, Ure Kretowicz, who had also loaned them $1.5 million secured by their interest in the project. The loan was due in March 2007, and if unpaid, Sarkisian and Medina's joint interest would decrease to 15 percent (7.5 percent each).

Between October 2006 and early 2007, Medina and Sarkisian discussed Kretowicz's loan and the low probability they could repay it. In mid-October 2006, Medina suggested to Sarkisian they could get between 40 and 50 million for Poinsettia Ridge. Sarkisian responded that they had "gone through this drill before" and the property could not yield a price in excess of $30 million. Medina pressed Sarkisian to

---

9     In part, Medina testified: "Based on this purchase and sale agreement, which is I think the one they used, [in] another 52 days I would have gotten another million dollars for my interest. So there's no way that I would sell my interest for [$900,000], when 52 days later I could get almost 2 million. That would just be stupid."

market and sell Poinsettia Ridge, but Sarkisian told Medina he and Kretowicz did not want to sell it; that "they were to going to hold it forever." However, Kretowicz testified that as of 2006, he was looking to Sarkisian and Medina to advise him about whether he should sell his interest in Poinsettia Ridge because they had expertise in income property. Kretowicz never told Sarkisian he wanted to hold the property for life or that he would never sell it.

Believing his interest was going to be diluted to a small percentage of ownership as of March 2007 because of the Kretowicz loan coming due, Medina became open to selling his interest. On January 10, 2007, Sarkisian met with Ayyad concerning Poinsettia Ridge. Sarkisian's oral agreement with Ayyad on that buy-out, which he and Ayyad reached before Medina signed the final separation agreement and never reduced to writing,[10] was that Ayyad would loan Sarkisian the money to repay the Kretowicz loan, and buy Medina's interest for $400,000. Ayyad was to be reimbursed at the close of escrow with interest. The terms of Sarkisian and Ayyad's agreement were not disclosed to Medina. Sometime during the first half of January 2007, Medina and Sarkisian agreed that Medina would sell his interest to Ayyad for $400,000, about a 60 percent discount, even though Medina believed his interest was worth over $1 million.

---

[10]    In his deposition, Sarkisian initially denied reaching that agreement with Ayyad before Medina entered into the final separation agreement, but when presented with documentation, admitted they had reached that agreement before February 8, 2007. Sarkisian admitted there was no promissory note or security agreement evidencing his and Ayyad's agreement.

On January 12, 2007, Sarkisian e-mailed Medina to tell him that Ayyad was going to get the deal done the following week. Medina asked whether Ayyad was buying both of their reduced interests, or the 35 percent interest including the Kretowicz note. Sarkisian responded: "Not sure yet, but he is definitely paying off the entire note and buying your interest. He is probably lending me my part of the note and maybe my remaining equity."

Medina's deal with Ayyad was complete on January 19, 2007. About the same time, Sarkisian wrote to Ayyad and expressed his appreciation for Ayyad's commitment, telling Ayyad he would make every effort to work hard and use his experience "to make our deals as successful as possible."

On February 9, 2007, the day after Medina signed the final separation agreement, Sarkisian obtained the latest financials and budget for Poinsettia Ridge, including a schedule of rents, and a few weeks later he forwarded that information to a broker, who eventually served as the broker for the project's sale. Three or four months later, Medina learned Poinsettia Ridge was in escrow and was going to sell.

D. *Analysis*

Sarkisian does not dispute that as a co-member of the LLC, he owed Medina a fiduciary duty. (Former Corp. Code, § 17153.) The jury was instructed accordingly. Thus, Medina's reasonable reliance is presumed, and Sarkisian's burden was to present direct evidence that Medina did not reasonably rely on the alleged false statements or omissions so as to overcome the presumption. (*Estate of Gump*, *supra*, 1 Cal.App.4th at p. 601; *Edmunds v. Valley Circle Estates*, *supra*, 16 Cal.App.4th at pp. 1301-1302.)

24

Whether Sarkisian met that standard was for the trier of fact to decide; on appeal, the question is governed by the substantial evidence rule like any other issue of fact. (*Estate of Gelonese* (1974) 36 Cal.App.3d 854, 863.) Here, the jury decided Sarkisian's evidence did not directly establish Medina's lack of reliance or unreasonable reliance for either transaction, and as we explain, we conclude its verdict is supported by substantial evidence.

      1. *Fallbrook Land Transaction*

With regard to the Fallbrook land transaction, Sarkisian argues that in view of the subsequent e-mails forwarded to Medina showing continued negotiations with Pala and the likelihood of a final deal, no reasonable person in Medina's position, and with Medina's knowledge and experience, would have relied to his detriment on the prior statement that the deal was dead. He characterizes Medina's decision to sell his interest to Ayyad as a business decision to receive "sure money" rather than a potential for unsure money if he elected to stay in the transaction. But Medina explained why he felt it unnecessary to continue to scrutinize the additional e-mails concerning Heritage's negotiations with Pala, having been led to believe by Sarkisian that the deal was dead and not going to "make." The jury could conclude on the above-summarized evidence that Sarkisian unreasonably delayed the deal's closing, then concealed the fact that Pala and Heritage had finally reached agreement to terms as well as the fact Pala had actually executed a "clean" purchase and sale agreement days before Medina entered into the final separation agreement, instead sending Medina a version of the document suggesting that negotiations were still heavy and ongoing. Medina testified he trusted his long time

25

business partner completely, and unaware that Sarkisian was preparing to partner with Ayyad in other deals, he had no reason to suspect that Sarkisian's efforts might tend to support Ayyad's interests rather than Medina's.

Under the circumstances, the jury reasonably concluded Medina continued to justifiably rely on Sarkisian's original statements, expecting that Sarkisian would inform him when Pala entered into the purchase and sale agreement. We will not second guess the jury's factual determinations. Without evidence Medina should have known Pala had reached an agreement with Heritage for the purchase of the Fallbrook land before entering into the final separation agreement, the jury properly determined Medina's reliance on Sarkisian's representations and omissions was justified.

We concede that the evidence shows Medina eventually did learn that a sale had occurred by virtue of his receipt of the additional $200,000 payment. But his knowledge came *after* Medina had finalized his buy out, and the existence of evidence—or inferences drawn from it—favorable to Sarkisian does not help Sarkisian in his attempt to challenge the sufficiency of the evidence.

2. *Poinsettia Ridge Transaction*

As to Poinsettia Ridge, Sarkisian maintains all the evidence showed Kretowicz had no intention to sell that property before March of 2007, when an unsolicited purchase offer came in, and there was no evidence Sarkisian had listed the property for sale or made preparations for its sale beforehand. Sarkisian points to the January 12, 2007 e-mail in which he told Medina that Ayyad was "definitely paying off the entire note and buying your interest" and "probably lending me my part of the note and maybe my

26

remaining equity." He argues that is "precisely" what Ayyad ultimately did. Sarkisian argues the evidence shows he fully informed Medina what Ayyad was going to do before Medina sold his interest in Poinsettia Ridge.

This evidence did not tend to rebut the presumption of Medina's reasonable reliance on Sarkisian's representations concerning the Poinsettia Ridge property. The key fact Sarkisian omitted from his discussions with Medina was that Sarkisian's deal with Ayyad included the expectation that Ayyad would be repaid from a sale. The jury reasonably concluded, viewing the evidence circumstantially, that given Sarkisian's undisclosed deal with Ayyad, Sarkisian's quick action in contacting a broker shortly after Medina's deal was finalized, and the rapid progress toward a sale, Sarkisian planned to facilitate that sale before he convinced Medina to sell his interest. As a result, Sarkisian avoided the loss of his equity, as did Ayyad, from the terms of the Kretowicz loan and Medina was left in the dark concerning the contemplated sale, convinced by his trusted, longtime business partner to sell his interest to Ayyad at a discount not knowing Ayyad was willing to step in and save Sarkisian's interest in Poinsettia Ridge from dilution and profit from Poinsettia Ridge's sale to a third party.

Sarkisian's arguments to the contrary ask us to view the facts and draw inferences in his favor. He maintains the evidence shows neither Kretowicz nor Sarkisian planned to sell Poinsettia Ridge until an unsolicited offer was made in mid-March 2007, pointing to his own testimony that Kretowicz decided to explore the opportunity after he experienced "liquidity issues." But Kretowicz testified he relied on Sarkisian on that point, and the jury was plainly convinced by that evidence over Sarkisian's self-serving

27

testimony. As we have explained, our role in assessing the sufficiency of the evidence is not to view the evidence favorable to Sarkisian, but to decide if the evidence and inferences favorable to Medina support the jury's finding. Sarkisian has not convinced us to overturn the jury's finding in this regard.

III. *Medina's Claim for Breach of the Covenant of Good Faith and Fair Dealing*

As stated above, the trial court granted JNOV on Medina's contract claim, and ordered the judgment modified to enter judgment in Sarkisian's favor on that cause of action. Pointing out the court failed to so modify the judgment, Sarkisian asks this court to modify the judgment to reflect the court's order, and also contends there can be no related recovery for breach of the implied covenant of good faith and fair dealing arising out of that same contract, requiring that the judgment on that cause of action be reversed as a matter of law. Medina responds that Sarkisian did not seek JNOV on the breach of the implied covenant claim, then consented to the entry of judgment in its final form, thus waiving these issues on appeal. As to the implied covenant claim, Medina further argues that the jury awarded him the same damages for Sarkisian's fraud and breach of fiduciary duty and argues that the judgment as to breach of the covenant of good faith and fair dealing should stand because he never conceded below that there was no contract, and "[a]greeing not to enforce a money judgment for breach of contract is not the same as conceding there was no contract, or conceding that there was no breach of contract."

Sarkisian's contentions have merit. "[It] is . . . well settled '[t]he prerequisite for any action for breach of the implied covenant of good faith and fair dealing is the existence of a contractual relationship between the parties, since the covenant is an

28

implied term in the contract.' [Citation.] 'Without a contractual underpinning, there is no independent claim for breach of the implied covenant.' " (*Jenkins v. JP Morgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497, 525; see also *Racine & Laramie, Ltd. v. Department of Parks & Recreation* (1992) 11 Cal.App.4th 1026, 1031 [implied covenant rests upon the existence of some specific contractual obligation and is a supplement to express contractual covenants; thus there is no obligation to deal fairly or in good faith absent an existing contract].) "[T]he implied covenant does not extend so far as to impose enforceable duties that are beyond the scope of the contract, nor does the covenant prohibit actions that are expressly authorized by the contract's terms." (*Jenkins*, at p. 525, citing *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 374.)

Based on these principles, whether the JNOV on Medina's sole contract claim necessarily requires JNOV on his claim for breach of the implied covenant is a pure question of law. As a consequence, Medina's waiver argument fails, because we may consider such an argument for the first time on appeal. (*Carman v. Alvord* (1982) 31 Cal.3d 318, 324 [rule that a litigant may not argue theories for the first time on appeal is inapplicable to a pure question of law]; see also *People v. Runyan* (2012) 54 Cal.4th 849, 859, fn. 3.) Having entered JNOV on Medina's contract claim, Sarkisian was also entitled to JNOV on Medina's claim for breach of the implied covenant of good faith and fair dealing. On remand we direct the trial court to modify its judgment to reflect JNOV in Sarkisian's favor on Medina's breach of contract and breach of the implied covenant of good faith and fair dealing claims.

29

IV. *Medina's Appeal of Order Denying Prejudgment Interest*

"Civil Code section 3287, subdivision (a) provides that a party is entitled to recover prejudgment interest on an amount awarded as damages from the date that the amount was both (1) due and owing and (2) certain or capable of being made certain by calculation. . . . [¶] Damages are certain or capable of being made certain by calculation, or ascertainable, for purposes of Civil Code section 3287, subdivision (a) if the defendant actually knows the amount of damages or could compute that amount from information reasonably available to the defendant. . . . In contrast, damages that must be judicially determined based on conflicting evidence are not ascertainable. [Citations.] A legal dispute concerning the defendant's liability or uncertainty concerning the measure of damages does not render damages unascertainable. [Citations.] On appeal, we independently determine whether damages are ascertainable for purposes of the statute." (*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 919.)

Medina contends the trial court erred by not awarding prejudgment interest to him on the damages flowing from the Pala and Poinsettia Ridge transactions. Medina argues: "For each of these transactions, both the amount of money owing to Mr. Medina and the date upon which Mr. Medina's right to that money are certain, *as the closing statements on those sales demonstrated, and as the testimony of Robert Taylor, Mr. Medina's damages expert, illustrated*. The damages awarded by the jury are in the exact amount of the combination of the damages sought from the sales of the [Pala] and Poinsettia Ridge projects and date from the date of sale of each project. The [Pala] project sold on April 4, 2007[,] while Poinsettia Ridge sold August 21, 2007. Exh. 1166." (Italics added.)

30

Medina maintains that before and after this litigation, Sarkisian knew the prices at which Medina sold his interest, and the price they were worth when sold. He also suggests this court should apply a liberal construction in deciding whether a claim is certain. He concludes: "For the foregoing reasons, *and those described in Medina's September 5, 2012 bench brief on this issue*, Medina should have been awarded pre-judgment interest at 7% on the awards for Pala and Poinsettia Ridge, from April 4, 2007[,] and August 21, 2007, respectively." (Italics added.)

In making these assertions, Medina neither summarizes nor provides any record reference to the trial testimony of his damages expert, Robert Taylor. He does not provide a record citation to his bench brief on the issue. Incorporation by reference is inappropriate in any event. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 294, fn. 20 ["It is well settled that the Court of Appeal does not permit incorporation by reference of documents filed in the trial court" or points and authorities contained in trial court papers, even if they are made a part of the appellate record]; *Colores v. Board of Trustees* (2003) 105 Cal.App.4th 1293, 1301, fn. 2.)

We looked to Medina's section of his brief entitled "Damages" for trial evidence to support his damage assertions. Medina states: "In the end, Medina got $400,000 from Willy Ayyad for his interest in Poinsettia Ridge. Roughly five weeks after the final separation was completed, Mr. Sarkisian entered into an agreement to sell that project, and he netted cash of $1,029,093. Rather than a 50/50 split, it was a 72% to 28% split. On Pala, Medina received a total of about $1,095,868. From the Pala sale, Sarkisian received net cash of $2,124,771. This translates to a 66% to 34% split, instead of 50/50.

31

*See* Exhs. 652, 411, 130. Combining the sales proceeds of Sarkisian and Ayyad on these transactions, and comparing them to Medina's proceeds, Medina netted 9% of the total monies from Poinsettia Ridge (vs. 91% for Sarkisian and Ayyad), and 22% from Pala (vs. 78% for Sarkisian and Ayyad). . . . Ayyad reaped profits totaling $2,198,927 on the sales of Medina's interests in these projects. Ayyad's annualized rate of return on the monies he paid to facilitate Medina's removal: 1535% on Pala, and 331% on Poinsettia Ridge. . . . [¶] Medina's damages were easily calculated: they were the difference between what Medina received for selling his interests vs. what he would have received had he stayed in the transactions a short time longer. For Pala, that was $766,667; Poinsettia Ridge was $824,919. Exh. 1166. The jury award of $1,591,586 was the total of these two numbers."

With the exception of trial exhibit No. 1166, which is a one-page summary entitled "Amounts Due to Rudy Medina" reflecting only the $766,667 and $824,919 figures and a *10 percent* (as opposed to 7 percent) simple interest calculation from the purported closing dates, none of exhibits referenced above (trial exhibit Nos. 652, 411, 130) are contained in the respondent's appendix. We found one, trial exhibit No. 652, in the appellant's appendix, but that exhibit is the final closing statement for Poinsettia Ridge (showing that Sarkisian netted $1,029,093.79 and Ayyad $2,502,855.33) and does not pertain to the Pala project. As for the references to the reporter's transcript, Medina cites to his counsel's opening and closing statements to the jury.

Counsel's arguments are not evidence. (*Villacorta v. Cemex Cement, Inc.* (2013) 221 Cal.App.4th 1425, 1433.) It is Medina's burden, as the appellant on this cross-

32

appeal, to cite to trial evidence in the record supporting his claimed damages as well as some evidence from which we can conclude those were actually apparent to or readily calculable by Sarkisian. (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768; *Children's Hospital & Medical Center v. Bonta* (2002) 97 Cal.App.4th 740, 774.) Medina's showing otherwise is simply insufficient. He has failed to cite *evidence* contradicting the trial court's finding that his damages were not certain or capable of being made certain by calculation, which we presume is correct unless shown otherwise. Just as it is Medina's burden to provide record references, it is also his burden to provide an adequate record for review. (*Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1433.) At bottom, Medina's showing does not enable us to independently determine whether the court erred in denying him prejudgment interest. It is not the obligation of this court to search the trial transcript, or the respondent's appendix, to locate factual support for his damages assertions. (*Evans v. Centerstone Development Co.* (2005) 134 Cal.App.4th 151, 166; *Del Real v. City of Riverside*, at p. 768.)

## DISPOSITION

The judgment as to Rudy Medina's causes of action for breach of contract and breach of the covenant of good faith and fair dealing is reversed and the matter remanded with directions that the superior court modify the judgment to enter judgment notwithstanding the verdict on those claims. The judgment and orders are otherwise affirmed. The parties shall bear their own costs on appeal.


O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


AARON, J.